A01A1104. BURNS v. DEES et al.
(557 SE2d 32)

BLACKBURN, Chief Judge.

Robert Lewis Burns filed this action for breach of contract, unjust enrichment, quantum meruit, breach of fiduciary duty, fraud, attorney fees and punitive damages against appellees Jeffrey Dees and William E. Frantz, as co-executors of the estate of John W. O'Donnell, and Phrazer Company, Inc. Burns appeals the trial court's grant of summary judgment in appellees' favor on each claim, as well as the trial court's denial of his motion for partial summary

---

[23] Id.

judgment on his breach of contract claim. For the reasons set forth below, we affirm.

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). A de novo standard of review applies to an appeal from a grant [or denial] of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.

*Matjoulis v. Integon Gen. Ins. Corp.*[1]

So viewing, the record reveals that, in the early 1970s, O'Donnell founded Phrazer Company and remained its sole shareholder throughout his lifetime. In 1976, O'Donnell met Burns, and they entered into an oral agreement, whereby Burns agreed to use his business expertise to develop certain Phrazer property in Orlando, Florida. In exchange, Burns was to receive a one-third interest in the profits and ultimate sale of the venture. The agreement contained no additional terms or conditions; there was no discussion regarding the allocation of costs or losses, frequency of payments of profits, the specific use of the property or sale of the property, or how the profits or proceeds were to be calculated and when and how they were to be distributed. The agreement was witnessed by two disinterested individuals.[2] Soon thereafter, Burns also became O'Donnell's salaried employee, working in management at O'Donnell's Presidential Hotel in Atlanta.

The Orlando, Florida, property was developed and opened in 1979 as the Rainbow Car Center ("RCC"), an airport valet and rental car lot. The record reveals that during the years that followed, O'Donnell represented to others that Burns had an ownership/partnership interest in RCC.

In 1985, Phrazer entered into a written lease-purchase agreement with James Shapiro and his company, providing Shapiro the right to lease RCC property (paying rent and certain profits from the business), with an option to purchase RCC on or before January 15, 1991, for the sum of $2 million. The agreement expressly provided for any purchase proceeds to be made payable to Phrazer. This lease-purchase agreement was attested by Burns. The record does not reflect any objection to this agreement by Burns at that time.

In 1988, the Presidential Hotel closed its doors, and O'Donnell

---

[1] *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997).
[2] One witness testified that "at that time, I don't think they had any dreaming idea of what they were going to do with — with the property."

stopped paying Burns a salary. The next year, O'Donnell entered into a written agreement with Burns, providing for Burns to receive $2 million if he could sell the Presidential Hotel for $10 million, within 30 days. Burns did not sell the hotel, and the written agreement expired upon its own terms. In 1991, O'Donnell rehired Burns (for $84,000 annually), to oversee the necessary maintenance at the Presidential Hotel property and to explore possibilities for the sale and/or reopening of the hotel.

In January 1991, Shapiro exercised his option to purchase RCC. All proceeds from the sale were disbursed to Phrazer, as provided for in the lease-purchase agreement. The lawyer handling the disbursement of proceeds testified that O'Donnell acknowledged a one-third/two-third agreement with Burns, but directed the attorney to pay the proceeds to Phrazer "for tax reasons," assuring that he would "take care of" Burns. Burns knew how the RCC proceeds were disbursed and agreed to such disbursement before it was completed.

Burns claims that a few days after the sale, O'Donnell approached him and stated as follows: "As you know I owe you much more than just the [RCC] situation. What I would like to do, Rob, is I would like to pay you out — you will be a very, very wealthy man — I would like to pay you out when — at the sale of the hotel," the sum of $2 million. Other witnesses confirmed that after the RCC sale, O'Donnell stated that he would "take care of" Burns in connection with the sale of the hotel.

Burns claims that O'Donnell's statement of owing Burns for "more than just the [RCC] situation," was a reference to "other ventures" that Burns and O'Donnell had entered into over the years. The record reveals that in 1981, O'Donnell purchased Turkey Mountain Farm, retaining sole ownership in the investment until his death. O'Donnell was also the owner and sole shareholder in VIP Travel, a company he sold in 1982. Finally, O'Donnell built Ansley Forest apartments in the 1960s, and he ultimately sold the property in 1984. Witnesses testified that O'Donnell indeed indicated that Burns had interests in these other businesses. However, there is no record evidence concerning the specifics of any alleged agreement between Burns and O'Donnell in connection with the "other ventures."

In June 1991, O'Donnell prepared a last will and testament, providing a gift of $25,000 to Burns. Two subsequent codicils prepared shortly before O'Donnell's death eliminated the bequeathed gifts for Burns and other family members.[3] Burns presented the testimony of O'Donnell's medical providers in an effort to show that he was inca-

---

[3] This appeal does not involve any claim in connection with the validity of the will, yet Burns believes that the circumstances surrounding the preparation of the will and codicil are relevant to the issue of fraud.

pable of reading or understanding the substance of the codicils.

O'Donnell died in February 1993. Thereafter, Burns approached appellee Frantz, co-executor of the estate, to assert his claim against the estate. Burns followed up with a letter from his attorney, seeking 25 percent of the proceeds from the RCC sale, with interest, as well as over $700,000, plus interest, allegedly owed from the "other ventures."

After the claim was denied, Burns filed a lawsuit, alleging breach of contract, piercing the corporate veil, constructive fraud, fraudulent conveyance, the tort of conversion and personal appropriation of corporate property. Burns later dismissed the action without prejudice. He renewed under OCGA § 9-2-61 and filed a new complaint, asserting claims for: (a) breach of contract; (b) fraud; (c) breach of fiduciary duty; (d) unjust enrichment and quantum meruit; and (e) attorney fees and punitive damages.

Appellees filed a motion for summary judgment on each claim. Burns also filed a motion for partial summary judgment on his breach of contract claim. The trial court granted appellees' motion and denied Burns' motion. We affirm.

1. Burns claims that the trial court erred by granting summary judgment in appellees' favor on his claims for breach of contract, fraud, breach of fiduciary duty, unjust enrichment, quantum meruit, attorney fees, and punitive damages. We disagree as to each claim.

(a) *Breach of Contract.* Burns contends that O'Donnell (acting individually and on behalf of Phrazer) made the following promises to Burns: (i) a share of one-third of the profit and one-third of the sale proceeds in RCC[4] and (ii) an unspecified interest in, and payment for, his work on "other ventures." Burns maintains that these agreements were enforceable, and not subject to the statute of frauds or statute of limitation. Pretermitting whether the agreements were subject to the statute of frauds or respective statute of limitation, the agreements are too indefinite to be enforced as a matter of law. For example, Burns' claim that he was entitled to a finder's fee from the sale of one of O'Donnell's properties would clearly be barred, as the sale of the property occurred in 1984. OCGA § 9-3-25. Even a contract taken out of the statute of frauds must be sufficiently definite as to its terms in order to be enforced. See *Bridges v. Reliance Trust Co.*[5]

"It is well-established that a contract does not exist unless the parties agree on all material terms. OCGA § 13-3-2. A contract can-

---

[4] It is curious that Burns' attorney's letter to the executors demanded only 25 percent of the RCC proceeds. However, viewing the facts in Burns' favor, we will assume that the agreement was for one-third of RCC's proceeds.

[5] *Bridges v. Reliance Trust Co.*, 205 Ga. App. 400, 401-402 (2) (422 SE2d 277) (1992).

not be enforced if its terms are incomplete, vague, indefinite or uncertain." *Cumberland Center Assoc. v. Southeast Mgmt. &c. Corp.*,[6] overruled on other grounds, *Atlanta Market Center Mgmt. Co. v. McLane*.[7]

> When a contract is substantially alleged, some details might be supplied under the doctrines of reasonable time or reasonable requirements. But indefiniteness in subject matter so extreme as not to present anything upon which the contract may operate in a definite manner renders the contract void. . . . [Moreover,] [a]lthough it is true that, in some contexts, partial performance may supply . . . definiteness, . . . deficiencies [are] not cured by performance [where] the agreement relied upon was so vague, indefinite and uncertain as to make it impossible for courts to determine what, if anything, was agreed upon, therefore rendering it impossible to determine whether there had been performance.

(Punctuation omitted.) *Jackson v. Williams*[8] (finding construction agreement unenforceable where there was no agreement regarding the material to use in construction, the precise location of the construction, the time period for construction). See also *Cumberland,* supra at 576 ("[t]he fact that [defendant] made voluntary commission payments and agreed that an agreement had been reached regarding some of the terms does not cure the deficiencies of the alleged oral agreement"). A court will not enforce an agreement where it is left to ascertain the intention of the parties by conjecture. Id. See also *Southeastern Underwriters v. AFLAC, Inc.*[9] (if the parties do not create a complete binding agreement, the courts are powerless to do it for them).

We find that the RCC and "other venture" agreements are indefinite and uncertain as to material subject matter such that they do not present anything upon which the agreements could operate. Moreover, any performance by Burns did not cure the deficiencies.

(i) *The RCC Agreement.* The RCC agreement is too indefinite and uncertain to be enforced. Courts have found contracts similar to the subject agreement to be unenforceable for indefiniteness. See *Jack-*

---

[6] *Cumberland Center Assoc. v. Southeast Mgmt. &c. Corp.*, 228 Ga. App. 571, 574-575 (1) (492 SE2d 546) (1997).

[7] *Atlanta Market Center Mgmt. Co. v. McLane*, 269 Ga. 604, 610 (2) (503 SE2d 278) (1998).

[8] *Jackson v. Williams,* 209 Ga. App. 640, 642-643 (1) (434 SE2d 98) (1993).

[9] *Southeastern Underwriters v. AFLAC, Inc.*, 210 Ga. App. 444, 446 (1) (436 SE2d 556) (1993).

*son v. Ford*[10] ("[t]o be enforceable, a promise of future compensation must 'be for an exact amount or based upon a "formula or method for determining the exact amount of the bonus." ' The sum must be 'definitely and objectively ascertainable from (the) contract' "); *Cherokee Falls Investments v. Smith*[11] (alleged land development contract unenforceable where it did not contain terms of how or when the development was to occur, the allocation of costs and profits between the parties, the proposed completion date for the development project, or whether the joint venture was limited to development of a certain area); *Cumberland,* supra at 575-576 (in connection with an alleged oral agreement of a payment of five percent of rent collected on property the court found that "[w]ithout any agreement as to the duration or breadth of the payments due . . . , we cannot find that an oral contract existed . . . [since such terms] were essential terms upon which the parties needed to agree before a contract existed").

In *Lemming v. Morgan,*[12] the defendant allegedly orally agreed that he would transfer one-half interest in a property to plaintiff and split any proceeds earned, in exchange for plaintiff's use of his expertise and skills in developing and reselling defendant's property. Later, when defendant refused to transfer the one-half interest, plaintiff sued. Id. We affirmed the trial court's grant of summary judgment, finding that the one-half interest oral partnership agreement was uncertain and indefinite because it failed to provide:

> when transfer of title, division of proceeds, or sale of the properties was to take place; how or when development was to take place on any of the properties; how development or other costs of the ventures were to be allocated; how, when or by whom it would be decided whether the properties would be sold or whether one-half of [defendant's] interests in the various properties would be transferred to [plaintiff]; or how proceeds would be calculated.

Id. at 764-765 (1). The fact that plaintiff may have performed his obligations under the agreement was inconsequential because, as the court found, " 'the agreement relied upon was so vague, indefinite and uncertain as to make it impossible for courts to determine what, if anything, was agreed upon, therefore rendering it impossible to determine whether there had been performance.' " Id. at 765 (1).

The RCC agreement is equally indefinite. It did not provide when the sale of RCC would take place; it did not encompass any

---

[10] *Jackson v. Ford*, 252 Ga. App. 304, 306 (555 SE2d 143) (2001).

[11] *Cherokee Falls Investments v. Smith*, 213 Ga. App. 603 (445 SE2d 572) (1994).

[12] *Lemming v. Morgan*, 228 Ga. App. 763 (492 SE2d 742) (1997).

agreement as to how the property, development, and other costs would be allocated; it did not take into account each party's responsibilities in the event the company experienced losses; it did not take into account the parameters of a lease on the property, including how lease payments would be allocated; and it did not encompass a formula for the determination of how the sale proceeds or profits would be calculated (e.g., gross or net) or how or when such profits or proceeds would be distributed. Such specifics were particularly important in this case, since the property was leased to Shapiro under a complicated lease-purchase agreement, attested by Burns, which specifically provided for certain payments to be made along the way (rent and profit from the business) and specifically provided for all sale proceeds to be made payable to Phrazer. Moreover, the fact that the parties now dispute whether or not profits were even made over the years (depending on whether it was considered gross or net) demonstrates the necessity of clear terms in the contract.

The facts in the record do not show with reasonable certainty what the parties intended to do in this agreement. Burns' subsequent work in connection with RCC does not reveal the intention of the parties. See *Cherokee Falls*, supra at 605 (1) (" '[n]owhere in the document is there any statement with reasonable certainty as to what the parties were obligating themselves to do to effect what they envisioned, or as to what they envisioned' ").

Burns also claims that when RCC was sold, O'Donnell promised that when the Presidential Hotel was sold in the future, he would pay Burns what he was "owed," both for the RCC deal and for work Burns had done in connection with the "other ventures," to the tune of $2 million. To the extent Burns offers this promise to bolster the existence of an RCC agreement, it does not cure the fatal deficiencies, as described above. Moreover, if Burns claims that O'Donnell's promise constitutes a new agreement, it would be based on past consideration (Burns' work on RCC and "other ventures"), which cannot support the existence of a contract. See *Whitmire v. Watkins*.[13]

Burns' reliance upon *Pacrim Assoc. v. Turner Home Entertainment*[14] and *Kueffer Crane &c. v. Passarella*[15] is misplaced. In *Pacrim*, the parties already had an existing licensing agency relationship, and the issue involved whether an additional oral licensing agreement was enforceable. *Pacrim*, supra at 762-763. The agreement involved the defendant's promise to make plaintiff its exclusive agent for licensing and merchandising of certain properties in Thailand for a one-year period ending on a certain date and subject to the defend-

---

[13] *Whitmire v. Watkins*, 245 Ga. 713, 714 (267 SE2d 6) (1980).

[14] *Pacrim Assoc. v. Turner Home Entertainment*, 235 Ga. App. 761 (510 SE2d 52) (1998).

[15] *Kueffer Crane &c. v. Passarella*, 247 Ga. App. 327 (543 SE2d 113) (2000).

ant's standard agency terms. Id. at 764. In connection with the alleged agreement, the defendant forwarded a memorandum detailing the licensing guidelines, royalty rates, licensing and merchandising approval process, and policies on copyrights and trademarks. Id. at 763. The court found the terms to be definite and that the parties did not leave any material terms to future negotiations. Id. at 764-765.

This case differs from *Pacrim* in all material respects. Unlike the contract in *Pacrim*, the Burns-O'Donnell contract did leave material terms to be negotiated in the future. Moreover, neither was there a previous relationship from which the parameters of the contract could be determined. There was no term specified for the contract, and there was no agreement as to payment dates, amounts, duration, or the calculation of such payments. Unlike the contract in *Pacrim*, the terms of the Burns-O'Donnell agreement were indefinite and unenforceable.

The same distinction applies in connection with *Kueffer Crane,* supra. There, the defendant agreed to provide plaintiff with a five percent interest in the corporation in return for the plaintiff providing certain services. Id. at 327-328. For the five years the contract was in place, the plaintiff received checks which equated to five percent of the defendant company's profits. Id. at 328. Also during those five years, plaintiff asked for stock certificates, but was told by defendant that the cost of having the certificates issued was prohibitive at the time. Id. at 329. In discussing the issue of whether the contract was definite, the court distinguished *Demer v. Capital City Cable*,[16] a case where "[t]he plaintiff did not know the type, number, or issuer of the shares he expected to receive, did not know the valuation method for the shares, and did not know what the [agreement] meant by such phrases as 'certain conditions will apply to this arrangement' and 'defendant will have repurchase rights.' " (Punctuation omitted.) *Kueffer Crane,* supra at 330-331. Stating without explanation that the *Kueffer Crane* agreement was unlike *Demer*, the court implied that such specifics were indeed present in the *Kueffer Crane* agreement, and that the agreement "did not leave matters to future negotiations." Id. at 331.

In contrast, material terms were left to future negotiations between Burns and O'Donnell. While in *Kueffer Crane*, a consistent five percent of the company's profits had been provided for five years, and thus, the calculation of such payment was determinable, here we are unable to determine from the instant contract or dealings how profits or proceeds were to be calculated, and we will not attempt to

---

[16] *Demer v. Capital City Cable*, 190 Ga. App. 40 (378 SE2d 162) (1989).

ascertain the intention of the parties by conjecture. *Cumberland,* supra at 576; *Ford,* supra at 306-307.

(ii) *Other Ventures.* The alleged "other venture" agreements are uncertain and indefinite. There is no record evidence to substantiate the existence of any agreement between Burns and O'Donnell concerning Burns' interests in the "other ventures." Neither Burns nor other witnesses could specify the material terms of these alleged agreements. The only documentary evidence Burns relies upon is the 1989 agreement where O'Donnell was to pay Burns $2 million if Burns could sell the Presidential Hotel within 30 days, as "payment for his efforts and counsel in this and other transactions, also for his service and devotion for many years." The hotel was not sold within 30 days, and the agreement expired on its own terms. The record is devoid of facts to show what Burns and O'Donnell were obligating themselves to do with respect to the "other ventures."[17] Thus, such alleged agreements were too uncertain and indefinite to be enforced.

Accordingly, as the claims against Phrazer rest upon the same allegations as the claims against the estate of O'Donnell, the trial court properly granted defendants' motions for summary judgment.

(b) *Fraud/Fraudulent Inducement.* Burns alleges that O'Donnell committed fraud by making promises with the intent not to perform, thereby inducing Burns to give up his own businesses to work with O'Donnell.[18] Burns makes the serious accusation that the executors played a role in changing O'Donnell's will, to Burns' and others' detriment (including O'Donnell's grandchildren), when O'Donnell was incapacitated and unable to understand the changes made. Burns also claims that the executors purposefully chose to probate the will in Florida in order to gain a windfall in fees and payments to themselves, and that they purposefully hid O'Donnell's wife's terminal illness from Burns in order to avoid her deposition being taken. The validity of the will and its administration are not at issue in this case. Notwithstanding the executors' actions in connection with the administration of the estate or O'Donnell's conduct with respect to enforceable contracts he may have had with others, Burns' action for fraud in this case "cannot be predicated on a promise which is unenforceable at the time it is made. As discussed above, [O'Donnell's] promise [to Burns] was, at all times, too indefinite to be enforced. It follows that the trial court properly granted . . . summary judgment

---

[17] E.g., with regard to Burns' allegation that he is entitled to a finder's fee for one venture, the essential elements of price and the due date of the payment are absent. See *Green v. Johnston Realty,* 212 Ga. App. 656 (442 SE2d 843) (1994); *BellSouth Advertising &c. Corp. v. McCollum,* 209 Ga. App. 441 (433 SE2d 437) (1993).

[18] Burns has apparently abandoned his allegation that O'Donnell pierced the corporate veil and misappropriated and converted Phrazer funds to his personal use in order to avoid payment to Burns.

on the fraud claim." (Punctuation and footnote omitted.) *Ford*, supra at 307-308. See also *Presto v. Scientific-Atlanta*.[19]

Burns' reliance on *Rogers v. deMonteguin*[20] is misplaced. Unlike the subject case, *Rogers* involved an enforceable building contract. Id. at 481.

Here, there was no enforceable agreement, either with respect to the original alleged agreement or O'Donnell's alleged subsequent promises. Fraud cannot be predicated on an unenforceable promise, and therefore summary judgment was proper in this case. *Ford*, supra; *Presto*, supra.

(c) *Breach of Fiduciary Duty*. Burns based his breach of fiduciary duty claim entirely upon the existence of a joint venture relationship between himself and O'Donnell. In the trial court and on appeal, Burns has argued only that if a joint venture contract existed, his breach of fiduciary duty should survive summary judgment. The record does not reflect that any enforceable joint venture contract existed. Burns points to no evidence thereof and fails to otherwise demonstrate the existence of either the contract or a fiduciary relationship which might establish O'Donnell's duties; therefore, his claim cannot survive summary judgment. See *O'Neal v. Home Town Bank &c.*[21] ("[t]he party asserting the existence of a fiduciary or confidential relationship bears the burden of establishing its existence").

(d) *Unjust Enrichment/Quantum Meruit*. Burns alleges that the trial court erred by finding his claims for unjust enrichment and quantum meruit barred by the four-year statute of limitation. OCGA § 9-3-26. Burns does not dispute that his original lawsuit did not contain these causes of action and that at the time they were brought, the statute of limitation period had run. Instead, Burns asserts that the claims were mere *amendments* to the complaint in the original action under OCGA § 9-11-15 (c). We disagree.

To suspend the running of the statute of limitation in a renewal action, the cause of action must be substantially the same as in the original action. *Heyde v. Xtraman, Inc.*[22] A defendant's liability " 'cannot be enlarged beyond that indicated by the pleadings in the first case.' " *Bertone v. Wilkinson*.[23] We have held that a plaintiff may not utilize the amendment provisions under OCGA § 9-11-15 (c) to attempt to add otherwise barred claims to renewal actions, when such claims are not substantially the same as the claims in the origi-

---

[19] *Presto v. Scientific-Atlanta*, 193 Ga. App. 606, 607 (3) (388 SE2d 719) (1989).
[20] *Rogers v. deMonteguin*, 193 Ga. App. 480 (388 SE2d 10) (1989).
[21] *O'Neal v. Home Town Bank &c.*, 237 Ga. App. 325, 330 (5) (514 SE2d 669) (1999).
[22] *Heyde v. Xtraman, Inc.*, 199 Ga. App. 303, 305 (1) (404 SE2d 607) (1991).
[23] *Bertone v. Wilkinson*, 213 Ga. App. 255, 256 (444 SE2d 576) (1994).

nal action. *Alfred v. Right Stuff Food Stores.*[24]

Burns' claims for unjust enrichment and quantum meruit were not included in the original complaint. They were raised for the first time in the renewal action, after the statute of limitation had run. Accordingly, such claims are barred.

Moreover, Burns' attempt to discredit *Alfred* as being contrary to *Young v. Rider*[25] is without merit. Unlike the subject case, the renewal action in *Young* contained the *same* causes of action as the original complaint. Id. at 148-149 (2).

Here, the unjust enrichment and quantum meruit claims were *not* part of the original complaint. Moreover, the dismissal which preceded Burns' assertion of these claims *was a dismissal of the entire action*, not merely a dismissal of certain claims. Thus, Burns' attempt to substantially change the cause of action is barred by the applicable statutes of limitation, and the trial court did not err in granting summary judgment as to these claims. *Heyde,* supra; *Bertone,* supra.

(e) *Attorney Fees and Punitive Damages.* Burns' claims for attorney fees and punitive damages rest upon the weight of his other claims. As Burns has not prevailed on any of his enumerations, his claims for attorney fees and punitive damages must fail. See *R. T. Patterson Funeral Home v. Head*[26] (attorney fees not recoverable); *Viau v. Fred Dean, Inc.*[27] (punitive damages not recoverable). The trial court did not err in granting summary judgment to defendants.

2. Having found that the trial court did not err in granting defendants' motion for summary judgment, it follows that there was no error in denying Burns' motion for partial summary judgment.

*Judgment affirmed. Pope, P. J., and Mikell, J., concur.*

DECIDED NOVEMBER 16, 2001 —
RECONSIDERATION DENIED NOVEMBER 29, 2001 — ▮▮▮▮▮▮▮▮

*Terry D. Jackson*, for appellant.

---

[24] *Alfred v. Right Stuff Food Stores*, 241 Ga. App. 338, 339 (2) (525 SE2d 717) (1999).

[25] *Young v. Rider*, 208 Ga. App. 147, 148-149 (2) (430 SE2d 117) (1993).

[26] *R. T. Patterson Funeral Home v. Head*, 215 Ga. App. 578, 586 (5) (451 SE2d 812) (1994).

[27] *Viau v. Fred Dean, Inc.*, 203 Ga. App. 801, 804 (4) (418 SE2d 604) (1992).