A02A0077, A02A0716. AUKERMAN et al. v. WITMER; and vice
versa.
(568 SE2d 123)

RUFFIN, Judge.

James Witmer sued his former employer, A. C. Aukerman Company ("ACAC"), and Arlie Aukerman for breach of a stock purchase agreement, breach of an implied covenant of good faith and fair dealing, and litigation expenses.[1] In response, ACAC asserted several counterclaims, including misappropriation of trade secrets and breach of fiduciary duties. Aukerman and ACAC subsequently moved for summary judgment on Witmer's claims, and Witmer filed a cross-motion, seeking summary judgment on ACAC's misappropriation of trade secrets and breach of fiduciary duty claims.[2]

The trial court granted the parties' cross-motions for summary judgment. In Case No. A02A0716, Witmer challenges the trial court's grant of summary judgment to Aukerman and ACAC on his breach of contract, good faith, and litigation expense claims. In Case No. A02A0077, ACAC appeals the trial court's ruling relating to its counterclaims. For reasons that follow, we affirm the trial court's decision in Case No. A02A0716, and we affirm in part and reverse in part the judgment in Case No. A02A0077.

---

[1] Witmer also alleged claims for specific performance, tortious interference with contractual relations, and negligent infliction of emotional distress. Those claims, however, are not at issue in these appeals, and it appears that Witmer withdrew his specific performance and emotional distress claims below.

[2] Witmer also moved for summary judgment on two other counterclaims that are not at issue in these appeals.

*Case No. A02A0716*[3]

1. Summary judgment is appropriate when no genuine issues of material fact remain and the movant is entitled to judgment as a matter of law.[4] On appeal, we review the trial court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party.[5]

Viewed in this manner, the evidence shows that Aukerman is the majority shareholder and chairman of the board of ACAC, a construction company that specializes in building concrete median barrier walls separating roadways. Witmer, a CPA, worked for ACAC from 1983 to August 2000, making day-to-day management decisions, drafting construction bids, preparing tax returns, and reviewing the comptroller's accounting methods. During his 17-year employment at ACAC, Witmer served as vice president, chief executive officer, and corporate director.

In late 1999, Aukerman, Witmer, and Aukerman's son, David, began discussing Aukerman's retirement and sale of the business. The three orally agreed in December 1999 that Witmer and David, ACAC's president, would purchase Aukerman's stock in the company for $1 million "net," meaning $1 million after taxes relating to the sale. They did not discuss a "per share" purchase price for the stock. Instead, Witmer calculated the share price that would produce $1 million net and arrived at $260 per share.

Witmer subsequently drafted a "Stock Option Agreement," dated January 1, 2000, which gave Witmer and David the option to purchase from Aukerman 4,988 shares in ACAC for $260 per share over a five-year period. According to Witmer's complaint, this document "reflected in part [the parties'] oral agreement." At deposition, Witmer explained that the "Stock Option Agreement" did not require him to purchase the shares; it simply gave him a purchase option. In addition, it provided that, beginning January 1, 2000, Witmer and David would make all decisions regarding employee bonuses. Although Witmer thought this document was the "final agreement" between the parties, it was never signed, and Aukerman specifically objected to being excluded from the employee bonus decisions.

After drafting the January 1, 2000 "Stock Option Agreement," Witmer continued discussing with Aukerman how to handle the tax consequences of the stock purchase. In January or February 2000, they considered altering the transaction structure so that Aukerman's $1 million payment would result from a combination of stock

---

[3] For ease of discussion, we address these appeals in reverse order.

[4] See *Burns v. Dees*, 252 Ga. App. 598, 599 (557 SE2d 32) (2001).

[5] See id.

purchase price and ACAC company profits. Under this structure, Witmer and David would pay Aukerman $156.25 per share. According to Witmer,

> We had talked about the best way tax-wise to handle this transaction. . . . Mr. Aukerman was going to get his million dollars net. That was our agreement, and we felt like this split between . . . profits and purchase of stock would be an acceptable way to do it and give him a reasonable amount for his stock and save a few dollars [in] taxes.

In a May 11, 2000 fax to Aukerman's attorney, Witmer confirmed that the parties had "revised [the agreement] to be a combination of stock and . . . profits" and that they would "revise [the] stock option agreement to reflect the $156.25/share." Witmer testified, however, that the parties planned to use this structure only if Aukerman could successfully buy out another stockholder, Ron Magner.

According to Witmer's complaint, he and Aukerman decided in March 2000 that Aukerman's attorney should put their "agreement" in writing. The attorney forwarded a copy of this proposed written agreement, entitled "Agreement for Purchase and Sale of Stock," to Witmer and Aukerman in May 2000. Rather than granting Witmer and David a stock purchase option, this document obligated them to pay Aukerman specified amounts over a five-year period in exchange for 4,988 shares of stock. Several other provisions in the May 2000 draft also differed from the "Stock Option Agreement" Witmer prepared in January 2000. Asked whether he was willing to sign the May 2000 document, Witmer responded: "We had one item in here that none of the three of us agreed to, and that's in the event that we didn't pay [Aukerman] the last dime of this agreement that [all of the stock] would go back to him."

The parties did not sign the agreement drafted by Aukerman's attorney. Aukerman subsequently indicated that, even after the buyout, he expected ACAC to pay his personal income taxes, as it apparently had always done. Witmer grew concerned that ACAC could not afford to pay these taxes, and, in July 2000, the parties met with CPA Fred Sheats to develop an answer to the tax questions that still plagued the buyout. Sheats suggested a solution, which Aukerman rejected.

Following this meeting, Aukerman informed Witmer that he would not discuss the buyout again until after the upcoming presidential election, which, Aukerman thought, might impact the tax situation. Witmer, however, decided that Aukerman "had no intention of living up to the [purchase] agreement" and resigned in August 2000. Witmer filed suit two months later, alleging that Aukerman

and ACAC had breached the December 1999 oral agreement relating to the buyout.

In granting Aukerman and ACAC summary judgment on this count, the trial court concluded, among other things, that the alleged oral agreement was too indefinite to be enforced. We find no error.

Under Georgia law, " 'a contract does not exist unless the parties agree on all material terms. A contract cannot be enforced if its terms are incomplete, vague, indefinite or uncertain.' "[6] Thus, "[a] court will not enforce an agreement where it is left to ascertain the intention of the parties by conjecture."[7] An indefinite contract, however, "may . . . acquire more precision and become enforceable because of the subsequent words or actions of the parties."[8]

Describing the oral agreement, Witmer testified: "I agreed that we would pay Mr. Aukerman a million dollars net. That was our agreement, and however we were to accomplish that, [Aukerman] had no problem with [the share price], and [the share price] was not a factor to me. He would get a million net." On appeal, Witmer similarly characterizes the "essential agreement" as follows: "the shares would be sold for $1 million, net of Mr. Aukerman's taxes on the sale." Like the trial court, we cannot find this "essential agreement" sufficiently definite to be enforceable.

The record shows that, after December 1999, the parties continued to negotiate many terms and conditions materially affecting the agreement. For example, the parties — or at least Witmer — initially contemplated a stock option arrangement that did not obligate Witmer or David to purchase any particular number of Aukerman's shares. When Aukerman's lawyer reduced the sales agreement to writing in May 2000, however, the stock purchase *option* had been replaced by a straight purchase arrangement *requiring* Witmer and David to buy 4,988 stock shares over a five-year period. Asked whether he had any objections to the May 2000 draft, Witmer raised no complaint about this change.

Thus, although the parties' "essential agreement" may have anticipated that Aukerman would sell 4,988 shares of stock for $1 million net of taxes, it did not clearly provide whether the transaction would be structured as a purchase contract or an option contract. Furthermore, the option arrangement outlined in the January 1, 2000 draft, which Witmer contends reflects the December 1999 oral agreement, might not have accomplished the ultimate goal of this transaction — purchasing Aukerman's shares for $1 million net. Witmer clearly testified that he and David were not required to buy

---

[6] (Citation omitted.) Id. at 601-602.

[7] Id. at 602.

[8] *Sanders v. Commercial Cas. Ins. Co.*, 226 Ga. App. 119, 121 (1) (485 SE2d 264) (1997).

all 4,988 shares involved in the option. Unless they purchased all 4,988 shares for $260 each, however, the total purchase price would not equal $1 million after taxes.

Moreover, the parties discussed three different pricing structures for this "essential agreement": (1) the December 1999 oral agreement and Witmer's January 1, 2000 draft contemplated a $260 per share price, giving Aukerman $1 million plus an additional $296,880 to defray taxes on the sale; (2) the parties also considered a $156.25 per share price, with the remaining purchase price to be paid from corporate profits; and (3) the May 2000 draft agreement required Witmer and David to pay Aukerman $1 million cash for 4,988 shares (a $200.48 share price) and provided that ACAC would indemnify Aukerman for taxes incurred through the sale.

These price structures incorporated disparate per-share prices, as well as differing levels of participation by ACAC. And although Witmer testified that the $156.25 per share/profits structure was available only if Aukerman could successfully buy out Magner's corporate shares, he offered no explanation as to when the parties anticipated using the $260 per share price versus the $200.48 per share price. Citing *Rhyne v. Garfield*,[9] Witmer argues that a sales contract can incorporate alternative forms of payment. Nothing in the record, however, indicates that the parties intended the third price structure to be an alternative to the first two, as opposed to a replacement.

The ever-changing price structure also illustrates the parties' difficulty in resolving the tax issues and deciding whether taxes relating to the sale should be paid directly by ACAC or included in the per-share purchase price. As Witmer admits, the parties continued to negotiate how best to handle the tax consequences — an issue that obviously concerned Aukerman — well after December 1999.

Thus, even if the parties settled on an overall purchase price for Aukerman's shares in December 1999, they never agreed on the structure of that sales transaction. In short, the record does not establish "with reasonable certainty what the parties intended to do in this agreement."[10] Their underlying purpose was the sale of the business through a stock transfer. We have been left to guess, however, about fundamental components of that transaction, such as the pricing structure, tax treatment, and whether the parties intended an option agreement or a straight purchase. Accordingly, the trial court did not err in finding this agreement vague, uncertain, and too indefinite to be enforceable.[11]

---

[9] 236 Ga. 694, 695 (225 SE2d 43) (1976).

[10] *Burns*, supra at 604.

[11] See id. at 604-605; cf. *Pacrim Assoc. v. Turner Home Entertainment*, 235 Ga. App. 761, 764-765 (1) (510 SE2d 52) (1998) (verbal agreement sufficient for court to determine terms and conditions on which parties intended to bind themselves).

We note that Witmer contends he partially performed his obligations under the agreement in December 1999, when he credited $37,500 from his 1999 bonus to Aukerman's "receivables account" at ACAC. Witmer viewed this transfer as an advance to Aukerman for stock that Aukerman would sell him in 2000. "[A]n objection of indefiniteness may be obviated by performance on the part of one party and the acceptance of the performance by the other."[12] Performance, however, cannot supply the necessary definiteness if the contract is so vague and uncertain that the court cannot determine what the parties agreed upon and whether there has been any performance of that agreement.[13]

As discussed above, regardless of whether the parties generally agreed that Witmer and David would purchase Aukerman's stock for $1 million net of taxes, they never settled on a structure for that transaction, leaving us in the dark as to how they intended this sale to proceed. Witmer's decision to transfer $37,500 to Aukerman for a future stock purchase does not resolve the uncertainties surrounding the agreement, such as whether it would be treated as a stock option or a straight purchase, what the share price would be, and how the parties would pay the taxes associated with the sale. Under these circumstances, Witmer's part performance did not cure the deficiencies plaguing the agreement.[14]

Similarly, the parties' actions after December 1999 lend no "precision" to the agreement.[15] Even if, as Witmer claims, Aukerman reduced his role in the company after December 1999, Witmer increased his responsibility at that point, and Aukerman told Witmer he had received a " 'good deal,' " this conduct does not render the agreement enforceable. Key terms of the December 1999 agreement remained wholly uncertain and under negotiation. The trial court, therefore, properly granted Aukerman and ACAC summary judgment on Witmer's breach of contract claim.

2. Witmer also argues that the trial court erroneously granted Aukerman and ACAC summary judgment on his claims that they breached an implied covenant of good faith in the December 1999 agreement and are liable to him for litigation expenses. Witmer admits, however, that these claims depend on the enforceability of the December 1999 agreement. As we found that agreement unenforceable, the trial court properly awarded Aukerman and ACAC summary judgment on these claims.

---

[12] *Sanders*, supra at 121.

[13] See *Burns*, supra at 602; *Lemming v. Morgan*, 228 Ga. App. 763, 765 (1) (492 SE2d 742) (1997); *Jackson v. Williams*, 209 Ga. App. 640, 643 (1) (434 SE2d 98) (1993).

[14] See *Burns*, supra at 603-604; *Lemming*, supra; *Jackson*, supra.

[15] See *Sanders*, supra.

*Case No. A02A0077*

In its cross-appeal, ACAC challenges the trial court's decision granting Witmer summary judgment on its trade secrets and breach of fiduciary duty claims. As discussed below, we affirm the ruling relating to trade secrets, but reverse the trial court's judgment as to breach of fiduciary duty.

3. Viewed favorably to ACAC,[16] the record shows that, in October 2000, Witmer began working as an independent contractor for Pittman Construction Company, a local general contractor. Although Pittman had not built concrete median barriers since the 1980s, it had recently obtained a median barrier job and the company's owners wanted to "get[ ] into barrier." Witmer subsequently helped Pittman bid for and obtain a barrier job for which ACAC also bid. At his deposition, Witmer recalled discussing with Pittman various information that ACAC factored into its bids, such as labor costs, travel costs, the amount of production ACAC expected for certain types of barriers, and profit margins.

Based on this testimony, ACAC argues that questions of fact remain as to whether Witmer misappropriated ACAC's confidential financial data relating to its bidding process. According to ACAC, such "financial data" constitutes a protected trade secret under OCGA § 10-1-761 (4).

The record shows, however, that this "financial data" trade secret argument differs from the arguments ACAC raised below. At the summary judgment stage, ACAC focused its arguments on "the Company's *entire process* of constructing, and bidding on the construction of, concrete median barrier walls, as a whole (collectively, the 'Company Process' or the 'Process') . . . , which the Company has developed."[17] Although ACAC discussed bidding as part of that overall process, the "Company Process" was the alleged trade secret ACAC sought to preserve. Throughout its motion, ACAC consistently referred to protecting the "Company Process" as a whole. As ACAC argued, "the entire Company Process, as a unified whole, gives the Company a competitive advantage and is a protectible trade secret."

Various forms of information can qualify as a trade secret under OCGA § 10-1-761 (4), "including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, *a process*, *financial data*, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the

---

[16] See *Burns*, supra at 599.
[17] (Emphasis supplied.)

public."[18] ACAC's arguments below focused on the *process* that it had developed, not on financial data. The company did not contend that particular components of its bids — such as labor costs, profit margins, travel costs, and production rates — qualified as "financial data" entitled to trade secret protection. Instead, it complained that Witmer had disclosed aspects of the company's bidding process, itself an integral part of the overall "Company Process."

ACAC concentrated below on branding its overall process as a trade secret. When that effort failed, it changed tactics and now seeks to characterize individual components of that process as protectible "financial data" under OCGA § 10-1-761. This court, however, "will not consider arguments neither raised nor ruled on in the trial court and that are asserted for the first time on appeal."[19] A party cannot abandon an issue in the lower court and then argue that issue on appeal.[20] And the record shows that ACAC did not raise or request a ruling on this "financial data" trade secret below.

Apparently aware that it asserted a different trade secret argument in the trial court, ACAC claims that, under *Dental One Assoc. v. JKR Realty Assoc.*,[21] a party may challenge a summary judgment award based on new arguments not raised below. ACAC, however, reads *Dental One* much too broadly. In that case, the Supreme Court addressed the evidentiary burden facing a party moving for summary judgment and determined that if the movant fails to meet that initial burden, the nonmovant can "urge the record's lack of evidence in that regard as a reason for reversing the grant of summary judgment, even if [the nonmovant] did not 'object' on that precise basis in the trial court."[22]

ACAC's trade secret argument does not fall within *Dental One*. On appeal, ACAC does not simply argue that Witmer failed to meet his initial evidentiary burden of "demonstrat[ing] by reference to evidence in the record that there is an absence of evidence to support at least one essential element of [ACAC's] case."[23] Instead, it alleges a new financial trade secret not addressed by the parties or the court on summary judgment. Accordingly, ACAC has waived this argument for appeal.[24]

---

[18] (Emphasis supplied.)

[19] (Punctuation omitted.) *Pfeiffer v. Dept. of Transp.*, 250 Ga. App. 643, 647 (3) (551 SE2d 58) (2001).

[20] See *Assn. Svcs. v. Smith*, 249 Ga. App. 629, 632 (1) (549 SE2d 454) (2001); see also *Boggs v. Madison County*, 240 Ga. App. 849, 852 (524 SE2d 252) (1999) (" 'An appellant cannot travel on one ground below, find the wind blowing in another direction, change tack, and head elsewhere on appeal.' ").

[21] 269 Ga. 616 (501 SE2d 497) (1998).

[22] Id. at 618 (1).

[23] *Lau's Corp. v. Haskins*, 261 Ga. 491, 495 (4) (405 SE2d 474) (1991).

[24] See *Pfeiffer*, supra.

4. Finally, ACAC argues that the trial court erroneously granted Witmer summary judgment on its breach of fiduciary duty claim. We agree.

The record shows that, following Witmer's departure, ACAC hired a forensic accountant to examine its financial records. According to this accountant, Witmer engaged in "unauthorized and unlawful accounting practices" while employed at ACAC, including using company funds to pay for personal bills. At his deposition, Witmer admitted that he decided to "run [certain repair costs for his son's car] through the company" in March 2000. He asserted that David approved these charges and that he planned to pay the company back for the expenses at the end of the year. Witmer, however, never paid the company back, and David testified that he did not know about or approve this use of company funds.

" '[C]orporate officers and directors have a fiduciary relationship to the corporation and its shareholders and must act in good faith.' "[25] This duty of good faith prohibits a fiduciary " 'from appropriating for himself the assets and property of the corporation.' "[26] ACAC presented evidence that Witmer, a corporate officer and director, used corporate funds without authorization to pay personal bills. This evidence raises a question of fact as to whether Witmer breached a fiduciary duty owed to ACAC.[27] Accordingly, the trial court erred in granting Witmer summary judgment on this claim.[28]

*Judgment affirmed in part and reversed in part in Case No. A02A0077. Judgment affirmed in Case No. A02A0716. Pope, P. J., and Barnes, J., concur.*

DECIDED JUNE 28, 2002.

*Chamberlain, Hrdlicka, White, Williams & Martin, Eric C. White, James L. Paul*, for appellants.

---

[25] *Paul v. Destito*, 250 Ga. App. 631, 635 (1) (550 SE2d 739) (2001).

[26] *GLW Intl. Corp. v. Yao*, 243 Ga. App. 38, 42 (3) (c) (532 SE2d 151) (2000).

[27] See id.

[28] On appeal and below, ACAC asserted that Witmer also breached his fiduciary duties to the corporation in other ways. Because we have determined that factual questions remain as to whether Witmer improperly used corporate funds to pay personal expenses, rendering summary judgment on ACAC's fiduciary duty claim inappropriate, we need not reach ACAC's other fiduciary duty arguments. See *Jackson v. Ford*, 252 Ga. App. 304, 311 (2) (b) (555 SE2d 143) (2001).

*Gambrell & Stolz, Gary A. Barnes, Nancy E. Gordon, Decker & Hallman, Robert D. Feagin, Webb, Lindsey, Collins, Jones & Wade, James H. Webb, Jr.*, for appellee.