**THIRD DIVISION**
**ANDREWS, P. J.,**
**DILLARD and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**November 13, 2013**

# In the Court of Appeals of Georgia

A13A1459. RICHARD BOWERS & CO. v. CLAIRMONT PLACE, LLC.

DILLARD, Judge.

Richard Bowers & Co. ("Bowers"), a real estate broker, filed a broker's lien against property owned by Clairmont Place, LLC ("Clairmont"), an owner and lessor of office space in Atlanta, and then sued Clairmont for unpaid commissions arising out of a leasing commission agreement between Bowers and Clairmont's predecessor. Clairmont denied Bowers's claims and asserted a counterclaim for slander of title. Bowers moved for summary judgment on its claims for unpaid commissions and on Clairmont's counterclaim, which the trial court denied. Bowers then filed an application for interlocutory appeal (which we granted), arguing that the trial court

erred in denying its motion for summary judgment. For the reasons noted *infra*, we agree and reverse.

Viewed in the light most favorable to Clairmont (*i.e.*, the non-movant),[1] the evidence shows that Clairmont owns commercial real estate located at 1800 Century Place in Atlanta (the "Property"). Clairmont is a successor-in-interest to ITT Commercial Finance Corp. ("ITT"), which previously owned the Property. And while ITT owned the Property, it entered into a rental agreement on June 6, 1993 (the "1993 Lease"), leasing an approximately 29,000 square foot portion of the Property to the Georgia Department of Technical & Adult Education ("DTAE").[2]

On June 6, 1993, ITT and Bowers also entered into the Leasing Commission Agreement that gave rise to the instant litigation. As compensation for services rendered in securing the 1993 Lease, ITT agreed to pay Bowers a commission of "five percent (5%) of the monthly rental paid by Tenant." The parties agreed that if the Property was sold to an "outside party," ITT would furnish Bowers with "an

---

[1] *See, e.g., S. Gen. Ins. Co. v. Wellstar Health Sys.*, 315 Ga. App. 26, 26 (726 SE2d 488) (2012); *see also* OCGA § 9-11-56 (c).

[2] DTAE was later renamed, effective July 1, 2008, the Technical College System of Georgia. *See* OCGA § 20-4-14 (a); *Coosa Valley Technical Coll. v. West*, 299 Ga. App. 171, 172 n.1 (682 SE2d 187) (2009).

2

agreement signed by the Purchaser assuming [ITT's] obligations to [Bowers] for payment of the commissions." The agreement also provided that if the "Lease"—which is undisputedly a reference to the 1993 Lease—was "renewed or extended, or if a new, additional, amended, or substituted Lease is entered into between Landlord and Tenant covering the Premises, or any part thereof," then the commission obligation would apply to rental payments by "Tenant under such renewal or extension, new, additional, amended, or substituted Agreement."

The term of the 1993 Lease, which was initially for a year, was extended through a series of amendments and renewal letters through June 2004. And during this time, CMD Realty Investment Fund II, L. P. ("CMD") purchased the Property and became the landlord under the 1993 Lease. In June 2004, the Georgia Building Authority (the "Building Authority") entered into an agreement (the "2004 Lease") with CMD to rent, through June 30, 2010, approximately 61,000 square feet of office space on the Property, which included the office space which had been rented to DTAE under the 1993 Lease.

The record includes the affidavit of Elliot M. Penso, formerly leasing director for the State Properties Commission, who was personally familiar with the 1993 Lease. According to Penso, because of restrictions on State of Georgia departments,

such as the DTAE, in making agreements for longer than a one year,[3] the Building Authority entered into the 2004 Lease with CMD, and the Building Authority in turn subleased the space to DTAE.[4]

Consistent with Penso's affidavit, the 2004 Lease shows that the parties agreed that the leased premises would be sublet to DTAE and that CMD would accept DTAE as the Building Authority's agent for purposes of paying rent and requesting repairs and maintenance services. In turn, the sublease shows that the DTAE was to occupy the same (and some additional) suites on the Property as it had leased under the 1993 Lease, and that DTAE would make its rental payments directly to CMD.[5]

Clairmont contracted to buy the Property in December 2004 from CMD. And as part of the real estate sale agreement, Clairmont assumed, among other contracts, the 2004 Lease and the Leasing Commission Agreement.[6] Following its purchase of

---

[3] *See* OCGA §§ 50-5-64, 50-5-77.

[4] Penso attached the 2004 Lease and the referenced sublease to his affidavit.

[5] The sublease and CMD's consent thereto did not, however, contemplate that the Building Authority would be relieved of its obligations under the 2004 Lease.

[6] The agreement between CMD, as seller, and Clairmont, as purchaser, contemplated that the parties would execute an assignment and assumption agreement, pursuant to which Clairmont would "assume[] all of the obligations of [CMD] under the Assumed Agreements [which included the 2004 Lease and the

the Property, Clairmont paid Bowers commissions under the Leasing Commission Agreement through June 2010. Then, effective July 1, 2010, Clairmont and the Building Authority entered into the "First Amendment to Rental Agreement" (the "2010 Lease") which, *inter alia*, extended the term of the 2004 Lease an additional ten years, through June 30, 2020.

In July 2010, Clairmont stopped making commission payments to Bowers, notwithstanding Bowers's demand for same. Consequently, Bowers filed a broker's lien against the Property on December 21, 2010, and then sued Clairmont to collect unpaid commissions within 90 days of the lien filing, and thereafter.[7] Bowers then filed a separate claim for unpaid commissions for the months of July, August, and September 2010, and amended its complaint to assert an alternate claim for breach of contract. Clairmont answered and counterclaimed for slander of title.

---

Leasing Commission Agreement] to the extent that such obligations are required to be performed on or after the date of this Assignment."

[7] *See* OCGA § 44-14-602 (d) ("When payment to a broker is due in installments, all or a portion of which is due only after a conveyance of the commercial real estate, any claim for lien for those payments due after conveyance may be recorded at any time subsequent to the conveyance so long as the claim for lien is recorded within 90 days of the date the payment was due and not paid.").

5

Thereafter, Bowers moved for summary judgment on its claims for unpaid commissions and on Clairmont's counterclaim. The trial court denied Bowers's motion for summary judgment, but issued a certificate of immediate review. This Court granted Bowers's application for interlocutory review, and Bowers then filed a timely notice of appeal.

1. The trial court denied Bowers's motion for summary judgment on its claims for unpaid commissions because (a) the Building Authority was not the "Tenant" for purposes of the Leasing Commission Agreement, (b) the 2010 Lease was a new lease for which Bowers could not claim a commission, and (c) the Leasing Commission Agreement was indefinite and, thus, unenforceable. Bowers contends that these conclusions were erroneous and that it was entitled to summary judgment as a matter of law. We agree.

(a) The Leasing Commission Agreement provides, in pertinent part, for payment of commissions equal to "five percent (5%) of the monthly rental paid by Tenant under this Lease." The trial court concluded that DTAE was the "Tenant" identified by the Leasing Commission Agreement and, therefore, because the current tenant was the Building Authority, rather than DTAE, Clairmont was not required to pay Bowers five percent of the rentals paid to Clairmont by the Building Authority.

6

At the outset of our analysis, we note that, as an initial matter, the construction of a contract is a matter of law,[8] which is subject to *de novo* review.[9] And in conducting this review, a court is to be "guided by three fundamental principles of contract construction."[10] First, a court must decide whether the language of the contract is clear and unambiguous, and if it is, the court simply enforces the agreement according to its clear terms—put another way, "the contract alone is looked to for its meaning."[11] Next, if the contract is ambiguous in some respect, "the court must apply the rules of contract construction to resolve the ambiguity."[12] Finally, if the ambiguity remains after applying the rules of construction, "the issue

---

[8] *See Chaudhuri v. Fannin Regional Hosp., Inc.*, 317 Ga. App. 184, 184-85 (1) (730 SE2d 425) (2012); *Schwartz v. Harris Waste Mgmt. Group*, 237 Ga. App. 656, 660 (2) (516 SE2d 371) (1999).

[9] *See Monitronics Int'l Inc. v. Veasley*, __ Ga. App. __ (746 SE2d 793, 801) (2013) (physical precedent only); *Goody Products, Inc. v. Dev. Auth. of City of Manchester*, 320 Ga. App. 530, 535 (2) (740 SE2d 261) (2013).

[10] *Goody Products*, 320 Ga. App. at 535 (2).

[11] *Chaudhuri*, 317 Ga. App. at 184-85 (1) (punctuation omitted); *see also Schwartz*, 237 Ga. App. at 660 (2) (punctuation omitted).

[12] *Chaudhuri*, 317 Ga. App. at 184-85 (1) (punctuation omitted); *see also Goody Products*, 320 Ga. App. at 535 (2).

of what the ambiguous language means and what the parties intended must be resolved by a jury."[13]

Looking first to the four corners of the contract, we note that "Tenant" is not a defined term under the Leasing Commission Agreement; and while it is certainly true that the word "Tenant" is capitalized, the agreement contains several capitalized words that are not defined. And on appeal, Clairmont maintains that the capitalization or lack thereof is crucial, arguing that "[t]his case turns completely on the distinction between lower case and capital letters." But it is not evident, at least on the face of the agreement, that the use of the capitalized word, "Tenant," as opposed to "tenant," has any determinative significance for purposes of interpreting the contract.

DTAE is, however, identified in the Leasing Commission Agreement, and it can certainly be inferred that DTAE is a Tenant, but not that "DTAE" and "Tenant" are synonymous terms. Rather, the Leasing Commission Agreement speaks to the "rental paid by Tenant under this Lease," which suggests a reliance on the 1993 Lease for purposes of establishing the meaning of "Tenant." Accordingly, we agree with

---

[13] *Chaudhuri*, 317 Ga. App. at 184-85 (1) (punctuation omitted); *see also Goody Products*, 320 Ga. App. at 535 (2).

8

Clairmont that the lack of clarity regarding the meaning of "Tenant" creates an ambiguity within the Leasing Commission Agreement.

In resolving an ambiguity, a court applies the rules of contract construction.[14] In that context, extrinsic evidence is admissible to explain a contract term that is ambiguous.[15] And as the payment obligations under the Leasing Commission Agreement are calculated from the monthly payments by the "Tenant" under the "Lease," it is entirely appropriate to examine the 1993 Lease to explain what the parties intended by "Tenant."[16]

As the trial court noted, the "Tenant" under the 1993 Lease was identified as DTAE. However, DTAE was also freely permitted to assign the 1993 Lease, without consent, to "another agency, department, commission, board or bureau within the Executive Branch of the State Government of Georgia, or to a State Authority." Thus,

---

[14] *See Woody's Steaks, LLC v. Pastoria*, 261 Ga. App. 815, 817 (1) (584 SE2d 41) (2003); OCGA § 13-2-2.

[15] *See* OCGA § 13-2-2 (1); *Archer Western Contractors Ltd. v. Estate of Mack Pitts*, 292 Ga. 219, 222 n.4 (1) (735 SE2d 772) (2012) (noting that parol evidence is admissible to explain all ambiguities, both latent and patent).

[16] *See* OCGA § 13-2-2 (1) (providing, *inter alia*, that "[a]ll the attendant and surrounding circumstances may be proved and, if there is an ambiguity, latent or patent, it may be explained . . . .").

from the outset it was expressly permissible for a State authority, such as the Building Authority,[17] to become the "Tenant."

Although this might not, in and of itself, resolve the ambiguity contained within the Leasing Commission Agreement as to the meaning of "Tenant," "[t]he construction placed upon a contract by the parties thereto, as shown by their acts and conduct, is entitled to much weight and may be conclusive upon them."[18] And under the trial court's construction of the Leasing Commission Agreement, the landlord's obligation to pay commissions thereunder would have ceased when the Building Authority entered into the 2004 Lease. Nevertheless, ITT's successor, CMD, continued to pay commissions while the Building Authority was the tenant, and then Clairmont assumed the 2004 Lease and the Leasing Commission Agreement, and likewise continued to pay commissions for years notwithstanding the fact that the Building Authority, and not DTAE, was the named tenant under the 2004 Lease.

---

[17] The "Georgia Building Authority" is "an instrumentality of the state and a public corporation." OCGA § 50-9-3.

[18] *Scruggs v. Purvis*, 218 Ga. 40, 42 (126 SE2d 208) (1962); *accord Head v. Scanlin*, 258 Ga. 212, 214 (1) (367 SE2d 546) (1988); *Hiers v. ChoicePoint Servs.*, 270 Ga. App. 128, 129 (1) (606 SE2d 29) (2004) (finding that, in suit for unpaid commissions, actions of parties in continuing to pay both commissions and consulting fees showed that parties did not intend to "do away with the commission agreement" when consulting fee payments began).

Thus, under the parties' construction of the Leasing Commission Agreement, as shown by their actions and conduct, the Building Authority could be, and was, a "Tenant" for purposes of that particular contract. We conclude, therefore, that the trial court erred in denying summary judgment to Bowers on the ground that Building Authority was not the "Tenant" contemplated by the Leasing Commission Agreement.

(b) The trial court also found that in light of the material differences between the 2004 Lease and the 2010 Lease, the 2010 Lease is a new lease that is not subject to the Leasing Commission Agreement. In doing so, the trial court relied upon the rule set forth in *Brannen/Goddard Co. v. Sheffield, Inc.,*[19] for distinguishing between

---

[19] 240 Ga. App. 667 (524 SE2d 534) (1999). Under *Brannen/Goddard*, we noted that:

In deciding whether a succeeding lease is substantially a renewal of a preceding lease or altogether a new lease, the determination can be based on whether the succeeding lease employs drastically different terms, not simply somewhat different considerations, i.e., is the lessee occupying substantially the same space under substantially the same terms? If the succeeding lease employs substantially the same terms as the preceding lease, it may be considered a renewal even though technically a "new" lease.

11

a renewal of a lease and an altogether new lease. But the Leasing Commission Agreement explicitly provides:

> If the term of the Lease is renewed or extended, or if a new, additional, amended, or substituted Lease is entered into between Landlord and Tenant covering the Premises or any part thereof, or covering any other premises as an expansion of, addition to, or substitution for the Premises herein leased, then in any one (1) or more of said events, Landlord agrees to pay to [Bowers] five percent (5%) of all rentals paid to Landlord by Tenant under such renewal or extension, new, additional, amended, or substituted Agreement.

And viewed in light of this provision, the differences between the 2004 Lease and the 2010 Lease are not such that it would sever Clairmont's obligation to make commission payments.[20] Moreover, the 2010 Lease is styled as a "First Amendment to Rental Agreement," and purports to reflect the parties' desire to "renew and extend the Lease Term" and "expand the square footage" of various rented suites. It provides that, except as set forth therein, the 2004 Lease "shall remain unmodified and in full

_Id._ at 669 (citation omitted.)

[20] _See Hunter v. Benamy Realty Co._, 115 Ga. App. 829, 831 (2) (156 SE2d 160) (1967) (finding that, "[t]he term 'new lease,' used here, would embrace not only a renewal of the original lease on substantially the same terms, but a completely new agreement employing drastically different terms as well, so long as the new lease covered the same 'premises, or any part thereof.'" (punctuation omitted)).

12

force and effect." And as in the 2004 Lease, the Building Authority was the named tenant. The parties acknowledged that the Building Authority subleased the rented premises to DTAE, and none of the provisions of the 2010 Agreement purported to change that arrangement.

The trial court noted that the landlord changed from CMD in the 2004 Lease to Clairmont in the 2010 Lease, but both CMD and Clairmont were successors in interest to the "Landlord" under the Leasing Commission Agreement, which is expressly binding on the Landlord's assigns, and they each assumed the obligations of the Landlord thereunder.

Another difference noted by the trial court was that the rented space was expanded to approximately 82,000 square feet in the 2010 Agreement from approximately 61,000 square feet in the 2004 Agreement.[21] The Leasing Commission Agreement contemplates, however, that the commission obligations would continue upon an expansion of the leased premises. As such, we simply cannot agree with the trial court that the 2010 Lease was so materially different from the 2004 Lease that

_____

[21] As the trial court noted, the lease term was also increased, the rental rate decreased, the number of parking spaces increased, and the broker (a party unrelated to this litigation) that represented CMD in the 2004 Lease was not the broker (another party unrelated to this litigation) who represented Clairmont in the 2010 Lease.

13

Clairmont had no obligation to make commission payments on account of rent paid thereunder. Rather, the 2010 Lease constitutes a lease "entered into between Landlord and Tenant covering the Premises or any part thereof," and so remains subject to the commission obligation under the terms of the Leasing Commission Agreement.

(c) The trial court also determined that the Leasing Commission Agreement is too vague and indefinite to be enforced in that it does not last for a specific period of time. As the trial court noted, our Court has explained that "[i]t is well-established that a contract does not exist unless the parties agree on all material terms," and "[a] contract cannot be enforced if its terms are incomplete, vague, indefinite or uncertain."[22] On the other hand, as a general principle, "[t]he law leans against the destruction of contracts on the ground of uncertainty,"[23] and "the objection of indefiniteness may be obviated by performance and acceptance of performance."[24]

---

[22] *Burns v. Dees*, 252 Ga. App. 598, 601-602 (1) (a) (557 SE2d 32) (2001) (citation and punctuation omitted); *See* OCGA § 13-3-2 ("The consent of the parties being essential to a contract, until each has assented to all the terms, there is no binding contract; until assented to, each party may withdraw his bid or proposition.").

[23] *Pine Valley Apartments Ltd. P'ship v. First State Bank*, 143 Ga. App. 242, 245 (2) (237 SE2d 716) (1977) (punctuation omitted).

[24] *Id.* (punctuation omitted).

14

Furthermore, we are unaware of any requirement that a contract for payment of commissions be for a predetermined period of time.[25]

Here, the parties agreed on all material terms, and it can be ascertained that Clairmont, as the landlord, owes commission payments under the agreement. As such, we conclude that the Leasing Commission Agreement, which had already been performed for many years, is not so indefinite as to be unenforceable.[26]

In light of the foregoing, we find that the trial court erred in denying Bowers's motion for summary judgment on its claims for unpaid commissions.

2. Finally, the trial court concluded that Bowers was not entitled to summary judgment on Clairmont's counterclaim for slander of title because Bowers had not shown that is was entitled to file a broker's lien against the Property for unpaid

---

[25] *See, e. g., Bd. of Regents of Univ. Sys. of Ga. v. A. B. & E., Inc.*, 182 Ga. App. 671, 672 (357 SE2d 100) (1987) (finding that trial court properly enforced purchaser's commitment "to pay commissions to [broker] of 5 percent of all rentals received for periods allocable after the date of the purchase closing, including all renewals and extensions of the tenant lease").

[26] See *Sanders v. Commercial Cas. Ins. Co.*, 226 Ga. App. 119, 121 (1) (485 SE2d 264) (1997) (finding that "[b]ecause the determination of whether a contract contains the requisite certainty must be made at the time enforcement is sought, an objection of indefiniteness may be obviated by performance on the part of one party and the acceptance of the performance by the other").

15

commissions.[27] However, given our conclusions in Division 1, *supra*, Clairmont cannot show that the lien filing was "false" or "malicious," and so Bowers was entitled to summary judgment on Clairmont's counterclaim for slander of title as well.[28]

*Judgment reversed. Andrews, P. J., and McMillian, J., concur.*

---

[27] *See* OCGA § 44-14-602 (a), (d).

[28] *See Latson v. Boaz*, 278 Ga. 113, 114 (598 SE2d 485) (2004) (defining elements of slander of title: "the plaintiff must allege and prove the uttering and publishing of the slanderous words; that they were false; that they were malicious; that he sustained special damage thereby; and that he possessed an estate in the property slandered." (punctuation omitted)).