A04A0439. KEY v. NAYLOR, INC. et al.
(602 SE2d 192)

BARNES, Judge.

Fay Key appeals the grant of summary judgment to Naylor, Inc., and Linda Naylor, as executrix and representative of the Estate of John W. Naylor (collectively "Naylor, Inc."), on Key's claims for breach of her employment contracts. She contends the trial court erred by deciding that one contract was not sufficiently definite to be enforced and that the second contract was unenforceable because the person signing on behalf of Naylor, Inc., did not have authority to bind the company. Key also contends that the trial court erred by finding that a separate promise by the now deceased John W. Naylor to convey to her 20 percent of the company's stock was unenforceable because of indefiniteness and lack of consideration.

1. The standards applicable to motions for summary judgment are announced in *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). Courts ruling on a motion for summary judgment should give the party opposing the motion the benefit of all reasonable doubt and should construe the evidence and all inferences and conclusions therefrom most favorably toward that party. *Moore v. Goldome Credit Corp.*, 187 Ga. App. 594, 595-596 (370 SE2d 843) (1988). Further, contract disputes are particularly well suited for adjudication by summary judgment because construction of contracts is ordinarily a matter of law for the court. *Burns v. Reves*, 217 Ga. App. 316, 318 (1) (457 SE2d 178) (1995). When reviewing a lower court's ruling on a motion for summary judgment, this court conducts a de novo review of the law and the evidence, *Desai v. Silver Dollar City*, 229 Ga. App. 160, 163 (1) (493 SE2d 540) (1997), and will affirm a grant of summary judgment if it is right for any reason. *Malaga Mgmt. Co. v. John Deere Co.*, 208 Ga. App. 764, 767 (5) (431 SE2d 746) (1993).

Where, as in this case, Naylor, Inc., did not have the burden of proof at trial, it likewise had no burden to affirmatively disprove Key's case. Instead, Naylor, Inc., need only point out the absence of evidence supporting her allegations. If Naylor, Inc., did so, Key was

obliged to point to specific evidence giving rise to a triable issue. OCGA § 9-11-56 (e); *Brown v. Buffington,* 203 Ga. App. 402, 403 (416 SE2d 883) (1992).

Giving Key the benefit of all reasonable doubt and construing the evidence and all inferences and conclusions therefrom in her favor, the record shows that she began working for Naylor, Inc., in 1989 and was promoted to vice president in 1990. Naylor, Inc., is a closely held family-owned business in the printing industry. Initially, the company was owned by John Naylor, the majority stockholder, his wife Linda Naylor, and their son Steve Naylor. The Naylors were all corporate officers and members of the company's board of directors.

In 2000, John Naylor was approaching retirement and he decided to appoint Steve Naylor as chairman of the board. At that time he told Steve that he wanted Key to have 20 percent of the company's stock, and according to Key, John Naylor informed her that she was being promoted to the position of company president and also told her that she would receive 20 percent of the company's stock.

At this time Key was an at-will employee of the company. Key testified that by promising to give her the stock, John Naylor intended to give her a vested interest in the company.

Key also testified that in October 2000 Steve Naylor proposed a ten-year employment contract for her, and that she and Steve Naylor signed the contract (the "2000 contract") that month. The contract is set out below.

Apparently the company functioned properly under this arrangement, but in September 2001, John Naylor died without conveying the 20 percent of the stock to Key. Upon his death, Linda Naylor became the majority stockholder of the company.

In December 2001, Key and Steve Naylor signed another contract concerning Key's employment (the "2001 contract"). Shortly before they did this, however, Linda Naylor had visited the company's offices and reviewed Key and Steve Naylor's advance accounts of their personal expenses that had been paid by the company. Linda Naylor was concerned about the amount of Key's expenses and, in a telephone conversation with Steve, demanded that Key repay the company. She later appointed herself chairman of the board, demoted Steve Naylor to company president, and removed Key as an officer and director. Later Key's employment with the company was terminated.

Key then sued Naylor, Inc., and Linda Naylor, in her representative capacity, to enforce the 2000 and 2001 contracts and the promise to convey 20 percent of the company stock. The defendants answered, and Naylor, Inc., asserted a counterclaim against Key to recover for improper payments she received. After discovery, the defendants moved for summary judgment on all of Key's claims,

contending that John Naylor's promise to give Key 20 percent of Naylor, Inc., stock was too indefinite to be enforced and also lacked consideration, that the 2000 contract was also too indefinite to be enforced, and that the 2001 contract could not be enforced because Steve Naylor lacked the authority to bind Naylor, Inc.[1] The trial court agreed and granted summary judgment. This appeal followed.

Because the parties are identified, the consideration is stated, and by signing the contract, the parties assented to its terms, Key first contends the 2000 contract was sufficiently definite to satisfy the requirements of OCGA § 13-3-1. According to Naylor, Inc., however, the contract is too indefinite to be enforced because it does not delineate the services Fay was to perform. Naylor, Inc., also contends that the contract was indefinite because Key could work as long as she wanted after the ten-year term and the clause on periodic salary increases made the contract indefinite. Naylor, Inc., also contended that it was entitled to terminate the contract because it had no termination provision.

As the party relying on the contract, Key had the burden of proving the contract's existence and its terms, *Jackson v. Easters*, 190 Ga. App. 713, 714 (1) (379 SE2d 610) (1989), and the test of an enforceable contract is whether its language is sufficient to plainly and explicitly convey the agreement between the parties. A promise must be sufficiently definite as to both time and subject matter to be enforceable. *Mabry v. Pelton*, 208 Ga. App. 891, 892 (1) (432 SE2d 588) (1993).

The 2000 contract states the following terms of Key's employment with Naylor, Inc.:

> — Ten years of employment. At the end of this term your agreement will be renew [sic] on a yearly bases [sic] for as long as you want to maintain your employment. If for some unforeseen reason you are not [sic] longer employed by Naylor this agreement is enforceable.
> — Your salary will be your current rate with periodic increases plus a $15,000 monthly allowance for expenses. These expenses will be disposed of at the end of each year as a bonus with taxes included.
> — You will also be granted 20% of the Companies [sic] stock per John Naylor's agreement.

---

[1] Naylor, Inc., also moved for summary judgment on its counterclaim, but the trial court found issues of material fact existed and denied the motion. Naylor, Inc., did not file a cross appeal on that issue, and the counterclaim remains pending in the trial court.

The agreement is signed by Steve Naylor, Chairman/CEO, and Key, President. Although John Naylor was still alive at this time, the agreement does not indicate his approval or awareness of the contract.

Key argues that this agreement was definite and enforceable. Her position was identified in the contract and parol evidence could describe her duties. She further contends that the contract is for a minimum term and a minimum salary and is not made unenforceable because of the provisions allowing renewals beyond ten years and indefinite salary increases.

Contrary to Key's assertion that the duties were sufficiently stated, we find that the failure of the contract to state what her duties were and to specify a place where they would be performed are fatal to the contract. *Zager v. Brown*, 242 Ga. App. 427, 430 (1) (530 SE2d 50) (2000). This agreement is on the letterhead of Webco Printing, a division of Naylor, Inc. Therefore, while parol evidence might be used to describe the duties of the president of Naylor, Inc., if the agreement were ambiguous, *ISS Intl. Svc. Systems v. Widmer*, 264 Ga. App. 55, 60 (2) (589 SE2d 820) (2003), this agreement does not identify the entity of which Key was to be the president and where the duties were to be performed. Further, the agreement complicates matters further by referring to the "Companies." Consequently, it is indefinite and thus unenforceable. *Sawyer v. Roberts*, 208 Ga. App. 870, 871 (432 SE2d 610) (1993).

Further, contrary to Key's argument that the provision stating, in effect, that she could work as long as she wanted after the initial term did not make the contract indefinite as to the initial term, see *Schuck v. Blue Cross & Blue Shield of Ga.*, 244 Ga. App. 147 (534 SE2d 533) (2000), we find the entire clause is indefinite as noted earlier. The three provisions read together, and particularly the last one, make the period of Key's employment impossible to ascertain. The first provision sets a ten-year term, the next provision allows Key to extend her employment indefinitely at her option, but the last provision allows Key to enforce the agreement indefinitely even if she was no longer employed by Naylor, Inc., even if that event occurs during the ten-year term. Therefore, even though *Cannon v. Geneva Wheel &c. Corp.*, 172 Ga. App. 20 (322 SE2d 69) (1984), relied upon by the trial court, may be distinguishable as it concerned an oral agreement for an indefinite term, the trial court did not err by finding the agreement was indefinite on the term of her employment, which

is an essential element of an employment contract. *Zager v. Brown*, supra, 242 Ga. App. at 430; *Sawyer v. Roberts*, supra, 208 Ga. App. at 871.

Additionally, the provision in the agreement stating that Key's "salary will be your current rate with periodic increases" also makes the agreement defectively indefinite. Although Key argues that this sets a definite minimum salary for the duration of the agreement, this is inconsistent with the requirement in the agreement calling for unspecified salary increases after unstated periods. This uncertainty renders the provision unenforceable. *Laverson v. Macon Bibb County Hosp. Auth.*, 226 Ga. App. 761, 762-763 (487 SE2d 621) (1997).

Key's argument that the indefinite provisions regarding her period of employment and salary are severable from what she considers the other enforceable provisions of the agreement is unpersuasive. We find it a significant indication of the parties' intent that the agreement does not contain a severability clause. Instead, we find that the contract was intended to be entire, and the defective provisions go to essential elements of the contract: the duration of the contract and Key's salary. OCGA § 13-1-8. Under the circumstances, we cannot find that these deficiencies were subsidiary to the essential purpose of the contract. Therefore, the indefinite statements regarding Key's duties, the term of her employment, and her salary made the contract unenforceable.

2. Key contends that the trial court erred by finding that the 2001 contract was unenforceable because it had not been approved by the board of directors of Naylor, Inc., because the provision in the corporate bylaws requiring such approval was waived by the corporate practice of setting officers' salaries informally. See *Morris v. Williams*, 214 Ga. App. 526, 527 (2) (448 SE2d 267) (1994). The bylaws of Naylor, Inc., provide that officers' salaries must be set by a resolution of the board of directors. In support of her argument, Key points to various instances in which salaries of Naylor family members and herself were not set by board resolution.

We do not reach that issue, however, because we find that regardless of whether the contract was approved, Naylor, Inc., was authorized to terminate the contract under the agreement's provision allowing Naylor, Inc., to terminate the agreement immediately for "just cause," with "just cause" being defined as conduct including, "but not limited to, conduct by [Key] amounting to gross or intentional misconduct."

The 2001 contract, in summary, provides that Key would be employed as the full-time president of Naylor, Inc., responsible to the chairman/CEO of Naylor, Inc., and her duties would "include all normal responsibilities associated with the position of President" along with such other duties as assigned by the chairman/CEO.

The period of Key's employment was for nine years from the date of the agreement, expiring on December 31, 2010. The agreement further provided that negotiations for any renewal of the agreement must be completed no later than December 31, 2009.

The agreement provided that Key could terminate her employment at any time upon 90 days' written notice, without penalty. Naylor, Inc., also could terminate the agreement with 90 days' written notice, but if it did, "rights to compensation and benefits provided [under the agreement would] become due and payable by Naylor, Inc., to [Key] immediately upon conclusion of the notice period." The agreement also provided that if Key became disabled during this term, Naylor, Inc., would "provide [Key] with all rights to compensation and benefits set forth in this Agreement, as if [she] were actively employed."

The agreement also permitted Naylor, Inc., to terminate it immediately for "just cause," with "just cause" being defined as conduct including, "but not limited to, conduct by [Key] amounting to gross or intentional misconduct." Disagreement about whether just cause for a termination existed would be submitted to binding arbitration.

Under the agreement, Naylor, Inc., would pay Key "a minimum base salary of no less than $180,000 for each year this Agreement [was] in effect," with the chairman/CEO periodically reviewing the base salary to decide any increases. Naylor, Inc., also agreed to provide Key with a $15,000 monthly expense account which would "be grossed up at the end of each year of this Agreement to cover [Key's] taxes on the monies paid" for expenses. Additionally, Naylor, Inc., was obligated to provide Key, for each year the agreement was in effect, with unspecified discretionary contribution to the Naylor, Inc., Retirement Savings Plan, $350,000 life insurance on Key's life, $150,000 life insurance on her spouse's life, short and long-term disability insurance, medical and hospitalization insurance, supplemental medical/hospitalization insurance, and use and maintenance of a company car. The agreement included a provision on non-waiver of rights, severability, choice of Georgia law, attorney fees for breaches, and a merger clause. Steve Naylor, as chairman/CEO, signed the agreement for Naylor, Inc.

Steve Naylor, however, denies that he knowingly signed the agreement and states that Key procured his signature by misleading him about the nature of the document he was signing. Moreover, when she procured this contract, Key knew that Linda Naylor, the new majority stockholder, had prohibited further advances, but she deliberately included a provision in the contract calling for an expense account that would be paid for by the company. Additionally, Key admits that she secured this agreement knowing that the

majority stockholder would not have approved it if she had known of it. Further, Key's actions in giving, without the knowledge of Steve or Linda Naylor, long-term employment contracts to members of her family, who were previously at-will employees, granting them conditions of employment more favorable than the other employees of Naylor, Inc.; her insistence that all hires be made through an employment agency that was making payments to her husband;[2] her direction to issue a check for $25,000 to her husband's company and prevaricating about the matter when questioned about it constitute "conduct amounting to gross or intentional misconduct."

Even though Key alleges that the check to her husband's company was Steve Naylor's idea and she denies knowing that her husband had received more than $800,000 as a result of her decision to require that Kentshire be the sole employment agency for Naylor, Inc., she does not deny being involved with the check scheme and requiring that Kentshire be the sole source of employees. Thus, these actions taken together with her other actions in defiance of Linda Naylor's policies fully justified Key's termination for cause. Accordingly, the trial court did not err by granting summary judgment to Naylor, Inc., on Key's claims based upon this agreement. A grant of summary judgment will be affirmed if it is right for any reason. *Malaga Mgmt. Co. v. John Deere Co.*, supra, 208 Ga. App. at 767.

3. Key further contends the promise to give her 20 percent of the stock of Naylor, Inc., was enforceable because that promise was definite and supported by consideration. We disagree. The record shows that the promise was anything but definite both as to which stock to be conveyed and when or if the transfer was to be made. *Burns v. Dees*, 252 Ga. App. 598, 601 (1) (a) (557 SE2d 32) (2001). In this instance, John Naylor did not identify the source of the stock to be transferred, and while Key argues that the corporation had sufficient shares of capital stock to transfer 20 percent of that stock to her, nothing shows that transferring capital stock was what John Naylor intended. Indeed, nothing shows what the 20 percent of the stock was intended to be. Did John Naylor mean 20 percent of the number of his shares or the company's shares, or 20 percent by value of his stock or the company's stock?

Further, no consideration for the promise was ever defined. While Key proposes that the promise was to ensure her loyalty to the

---

[2] During the investigation of the $25,000 check that Key ordered be issued to PlaceZit Group, Naylor, Inc., learned that PlaceZit was owned by Key's husband. It further learned that PlaceZit and Kentshire Group, the company that Key required be used for all employee hires, had the same business address. Over the years Naylor, Inc., had paid over $1 million to Kentshire Group, and of that sum, over $800,000 was paid to PlaceZit, the company owned by Key's husband.

company, nothing in the record shows that John Naylor made such a statement. In fact, her own testimony was that John Naylor said the stock was "in appreciation for everything [she] had done for John and Steve and the company." Thus, the promise was for past consideration, and that is not sufficient consideration to make the promise enforceable. *Burns v. Dees*, supra, 252 Ga. App. at 604 (1) (a) (i).

Accordingly, the trial court did not err by granting summary judgment to Naylor, Inc., and to Linda Naylor as executrix and representative of John Naylor's estate.

*Judgment affirmed. Blackburn, P. J., and Mikell, J., concur.*

DECIDED JULY 9, 2004.

*Mark R. Swanson, David A. Webster*, for appellant.
*King & Spalding, Rebecca C. Moore, Michael E. Ross*, for appellees.

