A08A1986. KITCHEN v. INSURAMERICA CORPORATION et al.
(675 SE2d 598)

PHIPPS, Judge.

This appeal concerns an agreement between Insuramerica Corporation and its former employee, Bobby Kitchen. Insuramerica, two of its subsidiaries, and its owner (collectively, "Insuramerica") sought, among other things, a declaratory judgment that the agreement did not make Kitchen a shareholder of the subsidiaries and that any agreement between the parties was unenforceable. Kitchen counterclaimed for damages based on several theories, including breach of contract. Addressing the limited question of the agreement's enforceability, the trial court granted Insuramerica's partial motion for summary judgment and denied Kitchen's cross-motion for summary judgment, holding that the agreement was not enforceable. For reasons set forth below, we find that the agreement was enforceable and thus reverse the grant of summary judgment to Insuramerica. We also reverse the denial of Kitchen's motion for summary judgment on the issue of the agreement's enforceability, but we affirm the denial of that motion to the extent the motion sought judgment as a matter of law on matters beyond the issue of the agreement's enforceability.

> To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. In reviewing a grant or denial of summary judgment, this Court conducts a de novo review of the evidence.[1]

Insuramerica Corporation was the parent corporation of Insuramerica Insurance Agency, Inc. and SafeAir Agency, Inc. All three corporations were privately held. Frank Jakes, Sr., was Insuramerica Corporation's chief executive officer and sole shareholder. In May or June 2005, Jakes and Kitchen discussed the possibility of Kitchen working for Insuramerica and receiving a 25 percent ownership

---

[1] *Ellison v. Hill*, 288 Ga. App. 415 (1) (654 SE2d 158) (2007) (punctuation and footnotes omitted).

interest in the subsidiaries. Jakes deposed that he "agreed to give [Kitchen] 25 percent of the stock of [the subsidiaries] as incentive to come on board." He further deposed to the following agreement with Kitchen:

> That upon execution of the necessary documents, that [Insuramerica Insurance Agency, Inc.] would issue [Kitchen] a number of shares of stock that would equal to 25 percent of the outstanding shares of that corporation. And then SafeAir Agency, Inc., would issue shares of stock to [Kitchen], along with the necessary documents that would equal to 25 percent of that corporation's outstanding shares.

By "necessary documents," Jakes meant a shareholder's agreement and other documents, such as a stock subscription agreement or stock purchase agreement, determined by legal counsel as required to effect the transfer.

On June 8, 2005, Kitchen and Jakes signed a "Letter of Understanding and Conditions of Employment" (the "June 8 letter"). This document stated: "This letter will both confirm and lay out the terms and conditions of employment and stock ownership of certain Insuramerica entities." The June 8 letter provided that Kitchen would hold the position of president with Insuramerica Corporation, Insuramerica Insurance Agency, Inc. and SafeAir Agency, Inc. The letter also specified Kitchen's annual salary, start date, and details concerning certain benefits. The June 8 letter then provided:

> Stock Assignments & Rights
>
> Insuramerica Insurance Agency, Inc. shall assign you 25% of its total outstanding stock. The distribution of these shares shall be in amounts and at times that [are] agreeable to both parties that will provide the best tax advantage.
>
> SafeAir Agency, Inc. dba SafeAir Underwriters shall assign you 25% of its total outstanding stock. The distribution of these shares shall be in amounts and at times that [are] agreeable to both parties that will provide the best tax advantage.

The June 8 letter further provided that "[a]t the end of five years, Kitchen may purchase stock in Insuramerica Corporation, over time determined by G. Frank Jakes, Sr. in accordance with his retirement plan." Finally, the June 8 letter stated: "Agreements. 1. Stock

Purchase Agreements[;] 2. Shareholders Agreements[;] 3. Bu[y] Sell Agreements funded by Life Insurance." The June 8 letter did not provide any further explanation about these referenced agreements and no such agreements were attached to the letter, but Jakes believed that the referenced agreements were "a necessary part of the transaction" and he told Kitchen that he would provide them for Kitchen's review and signature later.

The following day, Kitchen and Jakes met again to clarify Kitchen's employment and ownership interests. Jakes printed a copy of the June 8 letter, and Kitchen changed the date on the document to June 9, 2005 (the "June 9 letter"). The two men "sat and went through each of the items laid out" in the June 9 letter, which included several notations that Kitchen wrote by hand onto the June 9 letter during the meeting after Kitchen told Jakes that he could not "see starting until these have been at least put down in writing." These handwritten notations included the following:

> Revisions/Clarifications for Inclusion in Final Ownership Agreement.
>
> - Ownership contract will note 25% of all company contingency bonus to Bobby Kitchen (25% equity) paid after 1-1-07.
>
> - Equity — 25% ownership value is between 500 - 600,000. Agency equity valuation for Insuramerica Agency and SafeAir to be completed after 2006 physical [sic] year end.
>
> - Equity = value of the gross commission income [and] contingencies for SafeAir and Insuramerica Agency.
>
> - Past Liabilities/Debt/Loans — Frank Jakes will be responsible for these cost[s] incurred prior to my 25% ownership. . . .
>
> - Stock assignment will be finalized no later than 12-31-06 regardless of tax implications.
>
> - 25% ownership equity is absolute, non-revocable and not dependent on any performance criteria, quotas[,] etc.[2]

Kitchen also wrote on the June 9 letter, "Frank — Please see

---

[2] Kitchen's handwritten notes were comprised of a mixture of capital and lower case letters. For ease of reading we set forth the notes with conventional capitalization.

clarification and agreements as you have committed to me. If in agreement, please sign [and] return." Jakes and Kitchen signed the letter.[3]

Kitchen believed that the information contained in the June 9 letter subsequently would be incorporated into another document, and Jakes prepared a draft shareholders agreement that outlined specific details of a stock transfer to Kitchen. But Kitchen denied receiving a copy of this draft agreement, and the parties did not sign any further agreements concerning an assignment of stock to Kitchen. Jakes deposed that he did not proceed with the further agreements at Kitchen's request, because Kitchen was concerned about the tax implications of the transfer. Insuramerica did not identify Kitchen as an owner in certain business and regulatory filings, but on some occasions Insuramerica or Jakes referred to Kitchen as having an equity interest in the subsidiaries.

On May 31, 2006, Insuramerica terminated Kitchen's employment. In connection with the termination, the parties discussed how to compensate Kitchen for his "equity positions" in the subsidiaries. Kitchen disagreed with the valuation method proposed by Insuramerica, believing it was not what had been agreed upon when he started work. The parties never reached an agreement, and the underlying litigation ensued.

Insuramerica moved for partial summary judgment on its declaratory judgment claim and on certain of Kitchen's counterclaims, contending that Kitchen was not a shareholder of the subsidiaries and that "any agreement" between the parties was unenforceable. Kitchen also moved for summary judgment, contending that the parties' agreement was enforceable and conveyed to him a 25 percent ownership interest in the subsidiaries.

In its summary judgment order, the trial court ruled that the "parties' general agreement to transfer a 25% interest" in the subsidiaries to Kitchen was incomplete and unenforceable as a matter of law, because the parties did not have a meeting of the minds on certain terms essential to the contract. Specifically, the court pointed to the lack of a meeting of the minds concerning the allocation of tax consequences of the transfer between the parties, the responsibility borne by the parties for future losses of the subsidiaries, and what the parties would do if Insuramerica failed to

---

[3] Jakes deposed that he did not sign the June 9 letter, but has since taken the position both before the trial court and this Court that he did sign the letter. See *Froelich v. State*, 210 Ga. App. 647, 649, n. 1 (437 SE2d 358) (1993) (parties may make admissions in judicio in their pleadings, motions, and briefs, and such admissions of fact are binding upon the party and estop the party from denying the admission or introducing evidence to controvert the admission).

transfer the interests by December 31, 2006. Accordingly, the court granted Insuramerica's motion for partial summary judgment and denied Kitchen's motion for summary judgment.[4]

1. Kitchen contends that the court erred in finding that he did not have an enforceable agreement with Insuramerica. We agree.

The law does not favor destruction of contracts on grounds of uncertainty.[5] Nevertheless, "indefiniteness in subject matter so extreme as not to present anything upon which the contract may operate in a definite manner renders the contract void."[6]

> Under Georgia law, a contract does not exist unless the parties agree on all material terms. A contract cannot be enforced if its terms are incomplete, vague, indefinite or uncertain. Thus, a court will not enforce an agreement where it is left to ascertain the intention of the parties by conjecture. An indefinite contract, however, may acquire more precision and become enforceable because of the subsequent words or actions of the parties.[7]

"The test of an enforceable contract is whether it is expressed in language sufficiently plain and explicit to convey what the parties agreed upon."[8]

Viewed in the light most favorable to Kitchen, the evidence demonstrated a meeting of the minds between Kitchen and Jakes that by a certain date, December 31, 2006, Kitchen would be assigned a 25 percent interest in the subsidiaries in partial consideration for his employment with Insuramerica. The June 9 letter reflected this agreement and set out its material terms. Those terms provided that Kitchen would work for Insuramerica and its two subsidiaries in a certain position, that he would be paid a specific salary, that he would receive specific benefits, and that he would be assigned 25 percent of the total outstanding stock of the two subsidiaries by a certain date. The June 9 letter further provided a method for calculating Kitchen's 25 percent "ownership equity" by

---

[4] Although Insuramerica's motion for partial summary judgment presented several issues, the trial court, pursuant to an earlier scheduling order, expressly limited its ruling to whether the parties had an enforceable agreement to make Kitchen a shareholder in the subsidiaries. We are thus limited on appeal to a review of this specific ruling. See *Francis v. Francis*, 279 Ga. 248, 249 (611 SE2d 45) (2005) ("The rule is that the scope of review is limited to the scope of the ruling in the trial court.") (citation and punctuation omitted).

[5] *Fay v. Custom One Homes*, 276 Ga. App. 188, 190 (1) (a) (622 SE2d 870) (2005).

[6] Id. (punctuation and footnote omitted).

[7] *Aukerman v. Witmer*, 256 Ga. App. 211, 214 (1) (568 SE2d 123) (2002) (punctuation and footnotes omitted).

[8] *Kueffer Crane &c., Inc. v. Passarella*, 247 Ga. App. 327, 330 (3) (543 SE2d 113) (2000) (punctuation and footnote omitted).

defining equity to be the "value of the gross commission income [and] contingencies for [the subsidiaries]," allocated certain prior liabilities to Insuramerica, and provided that the equity interest was nonrevocable and not dependent upon performance criteria. Finally, the June 9 letter provided that the stock assignment would be finalized by December 31, 2006, "regardless of tax implications." We find these terms sufficiently definite to create an enforceable contract obligating Insuramerica to assign 25 percent of the subsidiaries' outstanding stock to Kitchen by December 31, 2006 in exchange for Kitchen's employment.[9]

We disagree with the trial court's conclusion that the June 9 letter was unenforceable because it did not address specifics concerning the allocation of tax consequences, the consequences if Insuramerica failed to assign the stock by the specified date, or the responsibility of the parties for future losses. The plain language of the letter demonstrated that the allocation of tax consequences was not a material term by requiring the assignment by a certain date "regardless of tax implications." If Insuramerica failed to assign the stock as required by the contract, it would be in breach, but a contract need not specify the consequences of a breach to be enforceable. And although the letter did not indicate which party would bear the burden of future losses, in light of the contract's other terms, including its definition of "equity," we do not find the lack of this specific detail to create an "indefiniteness in subject matter so extreme as not to present anything upon which the contract may operate in a definite manner."[10]

Differences between the terms of the agreement between Kitchen and Insuramerica and the terms of contracts involved in cases cited by Insuramerica render those cases inapposite.[11] The

---

[9] See *Mon Ami Intl. v. Gale*, 264 Ga. App. 739, 742 (2) (592 SE2d 83) (2003) (finding agreement that employee would receive ten percent of corporation in consideration for joining company sufficiently definite to establish enforceable contract); *Kueffer Crane*, supra at 330-331 (same); *Thompson v. Kohl*, 216 Ga. App. 148, 151 (4) (453 SE2d 485) (1994) (same); see also *Arby's, Inc. v. Cooper*, 265 Ga. 240, 241 (454 SE2d 488) (1995) (promise of future compensation made at the beginning of employment is enforceable if based upon formula or method for determining exact amount of future compensation).

[10] *Fay*, supra.

[11] See *Massih v. Mulling*, 271 Ga. App. 685, 687 (1) (610 SE2d 657) (2005) (promise of 20 percent ownership interest in company unenforceable where parties had not agreed on when interest would be conveyed or how company was to be structured); *Key v. Naylor, Inc.*, 268 Ga. App. 419, 425 (3) (602 SE2d 192) (2004) (agreement to transfer 20 percent of stock unenforceable where agreement did not provide for when or if transfer was to be made, what stock was to be conveyed, and what the percentage related to); *Burns v. Dees*, 252 Ga. App. 598, 603-606 (1) (a) (i) (557 SE2d 32) (2001) (oral agreement giving party 1/3 interest in profits and ultimate sale of business venture unenforceable because it lacked terms concerning allocation of costs and losses, frequency of payments, manner of calculating proceeds, and time of distribution); *Aukerman*, supra at 214-215 (oral agreement that one party would buy other's

YALE LAW LIBRARY

agreement here contained terms addressing when the stock assignment must occur, provided a method for calculating equity, and expressly stated that tax implications were not material to the transaction. Moreover, the record does not reveal any uncertainty or choice concerning the shares available to Kitchen, and the record likewise provides no indication that the parties intended to negotiate material terms of the transfer in the future. Rather, the record reflects that Insuramerica attributed the delay in assigning the stock to Kitchen's desire to postpone the transaction until he could determine the extent of its tax consequences.

There is no dispute that the parties intended that Kitchen be assigned a 25 percent interest in the subsidiaries by December 31, 2006 as partial consideration for joining Insuramerica. The June 9 letter provides enough detail on the terms of this agreement to render the agreement enforceable. To the extent those terms contain ambiguities, the court may apply statutory rules of contract construction and, if necessary, ask a factfinder to resolve material issues of disputed fact to determine the nature of the parties' obligations under the agreement.[12] Accordingly, we find that the court erred in granting Insuramerica's motion for partial summary judgment.

2. In his cross-motion for summary judgment, Kitchen contended that Insuramerica "wrongfully denied [him] his ownership interest" in the subsidiaries and asserted that he obtained this interest under his agreement with Insuramerica when he began working for the corporation. Although, as discussed in Division 1,[13] we find that the agreement was enforceable, its plain language did not support Kitchen's interpretation but rather demonstrated that Insuramerica agreed to transfer stock ownership to Kitchen by a certain date. It remains for the trial court to interpret this agreement and, in so doing, to determine if genuine issues of material fact exist for resolution by a factfinder. In light of the expressly limited nature of the trial court's summary judgment ruling, it also remains

---

stock for $1 million net unenforceable, where it did not provide for structure of transaction, pricing structure, or resolution of tax issues and evidence showed parties continued to negotiate many of these terms and discuss alternative terms after entering into agreement); *Lemming v. Morgan*, 228 Ga. App. 763, 764 (492 SE2d 742) (1997) (oral partnership contract obligating one party to transfer 1/3 interest in real property to other party "if and when" second party's tax problems subsided insufficiently definite to be enforced); *Demer v. Capital City Cable*, 190 Ga. App. 40, 43 (2) (378 SE2d 162) (1989) (agreement to transfer stock pursuant to an equity participation plan was unenforceable where party conceded that several provisions of plan remained to be determined, including which of several types of stock party would receive); *Sierra Assoc. v. Continental Illinois Nat. Bank &c.*, 169 Ga. App. 784, 788 (1) (315 SE2d 250) (1984) (agreement setting out various options for future agreement unenforceable, because it was merely an agreement to agree in the future on one of the options).

[12] See *Mon Ami*, supra.

[13] Supra.

for the court to consider whether any genuine issues of material fact exist concerning other required elements of Kitchen's breach of contract claim.

Accordingly, we reverse the denial of Kitchen's motion for summary judgment on the issue of the enforceability of his agreement with Insuramerica, but we affirm the denial of Kitchen's motion on the broader issue of his entitlement to recover for breach of the agreement.

*Judgment affirmed in part and reversed in part. Johnson, P. J., and Barnes, J., concur.*

DECIDED MARCH 19, 2009.

*Fried & Bonder, David S. Fried*, for appellant.

*Smith, Gambrell & Russell, Jason S. Bell, John R. Autry*, for appellees.

