**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**November 21, 2014**

# In the Court of Appeals of Georgia

A14A0809. WRIGHT et al. v. IC ENTERPRISES, INC. et al.

BRANCH, Judge.

This is a landlord-tenant dispute concerning two commercial properties in Doraville. On motions for summary judgment, the trial court ruled that the lease governing one of the properties was so riddled with errors as to be unenforceable, that undisputed facts showed that the landlord breached a post-lease agreement to improve that property for the tenant's benefit, that the tenant was not liable for any rent or fees associated with either property, and that the landlord was not entitled to retain the tenant's security deposits. Because these rulings were erroneous, we reverse.

In reviewing a trial court's ruling on a motion for summary judgment, we conduct a de novo review to determine whether the undisputed facts warrant judgment as a matter of law. OCGA § 9-11-56; *Vick v. Tower Place, L. P.*, 268 Ga.

App. 108 (601 SE2d 348) (2004). "[T]he opposing party should be given the benefit of all reasonable doubt, and the court should construe the evidence and all inferences and conclusions arising therefrom most favorably toward the party opposing the motion." *Eckerd Corp. v. Alterman Properties, Ltd.*, 264 Ga. App. 72, 74 (589 SE2d 660) (2003) (footnote omitted).

So viewed, the record shows the following relevant facts. The plaintiff/appellant is the landlord, Joseph Jerry Wright, individually and as trustee of the Wright IV Trust d/b/a Y & W Partnership ("Wright"), and the defendants/appellees are the tenant, IC Enterprises, Inc. ("ICE"), and its CEO, Il C. Park d/b/a National Supply ("Park"). Beginning in 1999, the parties and their predecessors executed various leases and amendments thereto in connection with two parcels of property – a 14,700 square foot warehouse and a smaller commercial space on the same street. Because the amendments refer to and incorporate previous leases, a detailed description of the documents is necessary.

*The larger property.* In May 1999, Wright entered into a detailed three-year lease with Young Choi d/b/a National Supply for the larger property. The lease gave the property's address (3206 and 3208 Oakcliff Industrial Street) and square footage (14,700), and it listed a base rental amount as well as a monthly common area

maintenance ("CAM") fee. The lease further provided that the tenant would pay for utilities, keep the premises "in good order, condition and repair," and pay attorney fees "[i]f any rent owing under this Lease is collected by or through an attorney at law."

In May 2002, Wright and Choi executed a one-page "1st Lease Amendment" which was "[t]o be attached to and made part of" the May 1999 lease and which extended the lease term for one year. In January 2003, Wright acknowledged in writing that the tenant had changed from Choi to ICE, reflecting Park's purchase of Choi's interest in National Supply. In May 2004 and May 2005, Wright and ICE executed two more amendments, both confusingly titled "2nd Lease Amendment," that were "[t]o be attached to and made part of" the May 1999 lease and that further extended the lease term through May 2008.

In April 2008, Wright and ICE executed a "3rd Lease Amendment" that is the main subject of this dispute. This amendment listed the property as the 14,700 square foot warehouse space at 3206 and 3208 Oakcliff Industrial Street in Doraville, extended the lease term for three more years, raised the rent, and kept the same CAM fee listed in the original lease. As with the previous amendments, the "3rd Lease Amendment" specifically provided that "[a]ll other terms and conditions of original

3

lease are hereby reconfirmed as being in full force and effect." Unlike the previous amendments, however, the "3rd Lease Amendment" recited that it was "[t]o be attached to and made part of that certain lease dated *the 12th day of January 2007* between [Wright] as Landlord, and, Young Choi d/b/a IC Enterprises, Inc., later amended to I. C. Park d/b/a National Supply, as Tenant." (Emphasis supplied.)

*Smaller property*. In March 2005, Wright entered into a detailed agreement with Michael and Loudi Aoun to lease a small commercial parcel for three years. Like the lease pertaining to the larger property, this lease provided that the tenant would pay utilities and a CAM fee; it also provided that the prevailing party in an action brought to enforce the lease could recover reasonable attorney fees. In May 2005, the lease was amended to reflect the tenant's relocation down the street to a similar property also owned by Wright.[1]

On January 12, 2007, Wright and the Aouns executed a "Lease Assignment" that amended the March 2005 lease, as amended in May 2005, to reflect that ICE was the new tenant. Notably, the date of this assignment is the same date to which the "3rd Lease Amendment" for the larger property refers. And in February 2008, Wright and

---

[1] This amendment incorrectly referred to the date of the original lease for the smaller property as "May 1, 2005," rather than March 2005.

ICE executed a "2nd Lease Amendment" for the smaller property which was "[t]o be attached to and made part of that certain lease dated the 12th day of January 2007" and which extended the lease term through April 2011.

*The dispute.* At some point in 2008, Park determined that National Supply needed a new business license in the name of its new owner, ICE. In July 2008, Park learned that the county would not issue a certificate of occupancy, a prerequisite for a business license, unless a sprinkler system or fire detection system was installed at the larger property. Park's assistant, Lisseth Morales, appealed to Wright's property manager, Katherine Warden, who offered to hire a consultant or "expediter" to help ICE negotiate with the county. In November 2008, Warden sent Morales the following email:

> [Wright] had agreed to hire the expediter to facilitate getting your business license/CO, which is NOT our responsibility. I will have them contact you to set up a meeting to resolve this issue. Your lease does not expire until May, 2011. If the county forces the issue to install the sprinkler system or fire detection system with smoke and heat and removal and draft curtains, the Landlord will pay for it. . . . We hope that you will continue to work in good faith to get your business license. . . . Please let us know asap, end of today latest, if you are continuing to move forward to break your lease and vacate the Premises.

Morales responded:

> We do not wish to deal with an expediter regarding the CO matters. Our lawyer has recommended that we not deal with an expediter because we are working to vacate the premises as we have previously told you. We will let you know the moving out date in advance.

Despite Morales's statement that ICE would be vacating the premises, Warden offered other options that she hoped would assuage the county's fire worries, such as installing emergency lights at Wright's expense and having ICE upgrade its fire extinguishers, but ICE refused to pay for the extinguishers. Warden also offered to relocate ICE to a different property owned by Wright where it could obtain a certificate of occupancy without trouble, but ICE, in Park's words, "ignore[d]" this offer.

> In January 2009, Warden sent Park a letter regarding the sprinkler system:

> As for the sprinkler, we still must submit and have the county come out beforehand to evaluate the situation. . . . If there is no other alternative to installing the sprinkler, it will be done. Please address the other items and we will move forward with the county.

Park, however, responded that "the only best way to solve the problem is to install the sprinkler." Ultimately, Warden informed Park that the least expensive sprinkler

6

system she could find cost more than Wright could afford. There is no evidence in the record that ICE ever tried to get a certificate of occupancy using the alternatives that Warden had suggested.

In November 2009, Park notified Warden that ICE would be vacating both properties by January 31, 2010. ICE paid the rent for both properties through that date, at which point it moved to a new location. The properties were unoccupied until June 2010, when new tenants apparently moved in.

Wright sued Park and ICE for breach of the lease agreements, seeking unpaid rent, utilities, and CAM fees from February through June 2010 for both properties, the cost of various repairs to the larger property, and attorney fees. Park and ICE answered, admitting that ICE had occupied the premises but denying the existence of any enforceable lease agreements and asserting various counterclaims seeking, among other things, the return of ICE's security deposit.

The parties filed cross-motions for summary judgment, which the trial court resolved in favor of Park and ICE. The court ruled that due to errors in the "3rd Lease Amendment," no enforceable lease agreement existed with respect to the larger property; ICE was thus a tenant-at-will not liable for any unpaid rent because it gave the requisite 60 days' notice of its intent to vacate the premises. Further, the court

7

ruled, even if the "3rd Lease Amendment" was enforceable, ICE was not liable for utilities, CAM fees, or attorney fees with respect to either property. The court also concluded that Wright had breached an enforceable promise to install a sprinkler system in the larger property, thereby foreclosing his right to seek rent for that property. Finally, the court held that Wright failed as a matter of law to prove that ICE had caused any compensable damage to the larger property and that ICE was entitled to the return of its security deposit.

1. Wright argues that the trial court erred by finding that the lease pertaining to the larger property was not an enforceable contract. In its order, the court highlighted three errors in the "3rd Lease Amendment" executed in April 2008:

> 1) it begins by trying to incorporate a previous lease dated January 12, 2007; despite that the record confirms that neither of the previous leases dealing with the First Property were dated January 12, 2007; 2) it states that it is being incorporated into a lease that was entered into by Young Choi d/b/a IC Enterprises; despite that the record confirms that there was no lease that was entered into by Young Choi d/b/a IC Enterprises signed on January 12, 2007; and 3) it states that it is incorporating itself into a previous lease that was signed by Yong [sic] Choi d/b/a National Supply and later amended to IC Park d/b/a/ [sic] National Supply, despite that the record confirms that no such described amendments were ever made.

The court concluded that these errors rendered the "3rd Lease Amendment" so indefinite in subject matter as to be void. We disagree.

8

It is true, as the trial court noted, that "indefiniteness in subject matter so extreme as not to present anything upon which the contract may operate in a definite manner renders the contract void." *Burns v. Dees*, 252 Ga. App. 598, 601-602 (1) (a) (557 SE2d 32) (2001) (alleged agreement to provide portion of profits and sale proceeds from complicated business venture was too indefinite to show parties' intent). It is equally true, however, that "[t]he law does not favor destruction of contracts on grounds of uncertainty." *Kitchen v. Insuramerica Corp.*, 296 Ga. App. 739, 743 (1) (675 SE2d 598) (2009) (footnote omitted). A contract is enforceable if it is "expressed in language sufficiently plain and explicit to convey what the parties agreed upon." Id. (punctuation and footnote omitted).

A valid lease must identify the parties, the property, the consideration, and the "terms of payment." *Estate of Ryan v. Shuman*, 288 Ga. App. 868, 871 (1) (655 SE2d 644) (2007) (citation omitted); see also OCGA § 13-3-1 (elements of valid contract include parties able to contract, consideration, mutual assent to terms, and a "subject matter upon which the contract can operate"). Here, the "3rd Lease Amendment" identified the parties, described the property, listed the rental price, and stated the lease term. It met the requirements for a valid lease and was enforceable on its own. Compare *Nacoochee Corp. v. Suwanee Investment Partners, LLC*, 275 Ga. App. 444,

446 (1) (620 SE2d 641) (2005) (handwritten "Lease Deal" that contained only a payment schedule and brief liquidated damages and indemnification provisions, without identifying the property or the precise tenant, was invalid).

Moreover, we hold that the "3rd Lease Amendment" incorporated the original lease that ICE's predecessor and Wright had executed in 1999. The incorporation provision states that the "3rd Lease Amendment" is

> [t]o be attached to and made part of that certain lease dated the 12th day of January 2007 between Yost & Wright, LP, as Landlord, and, Young Choi d/b/a ICE Enterprises, Inc., later amended to I. C. Park d/b/a National Supply, as Tenant, covering premises of (approximately 14,700 square feet), of Office/Warehouse space located at 3206 & 3208 Oakcliff Industrial Street, Doraville, GA 30340.

Further, the "3rd Lease Amendment" provides that "[a]ll other terms and conditions of original lease are hereby reconfirmed as being in full force and effect." To construe this language, we first ascertain whether the language is clear and unambiguous; if so, we simply enforce it as written. *Fab'rik Boutique v. Shops Around Lenox*, __ Ga. App. __ (2) (763 SE2d 492) (2014) (Case No. A14A0937, decided September 8, 2014) (citation and punctuation omitted). As the trial court correctly noted, the

10

incorporation provision contains an error[2] precluding us from enforcing it as written: it lists the date of the lease to be incorporated as January 12, 2007, but the original lease actually was executed on May 1, 1999. This erroneous date reference creates a patent ambiguity, as it is not immediately clear which lease is meant to be incorporated.

Accordingly, we "must apply the rules of contract construction to resolve the ambiguity." Id. The first of these rules, set forth at OCGA § 13-2-2 (1), allows us to consider parol evidence to prove "[a]ll the attendant and surrounding circumstances" and to explain "an ambiguity, latent or patent." An examination of all ten documents that comprise the parties' landlord-tenant relationship – that is, the two original leases together with their various amendments and assignments – shows that the parties meant to incorporate the original lease of the larger property, dated May 1, 1999, into the "3rd Lease Amendment." The amendment's reference to January 12, 2007, which is the date that ICE assumed the lease of the smaller property, is a simple date mistake or typographical error and is not so egregious as to void the incorporation provision. See *Zakaria v. McElwaney*, 174 Ga. App. 149, 151 (2) (329 SE2d 310) (1985) ("It is

---

[2] Although the trial court purported to find three separate errors in the "3rd Lease Amendment," there is really one error that the court described three different ways.

11

well established that any mistake in a contract, consisting of an unintentional act or omission, that is a clerical error, which in no way changes the contract or the relationship of the parties should not be permitted to defeat the clear intention of the parties.") (citations omitted). Accordingly, the trial court should have granted Wright's motion for summary judgment and denied ICE's motion for summary judgment on the issue of the enforceability of the "3rd Lease Amendment."

2. Wright also argues that the trial court erred by ruling that ICE was not obligated to pay CAM fees, utilities, or attorney fees with respect to either property. We agree.

As to the larger property, the original lease provided that ICE was responsible for CAM fees, utilities, and attorney fees, and as discussed in Division 1, the "3rd Lease Amendment" incorporated the original lease.[3] The same is true for the smaller property: the original lease that ICE assumed expressly provided that the tenant was liable for such expenses, and the parties' final amendment to that lease contained the same clause "reconfirming" the original lease provisions "as being in full force and

---

[3] Even if the trial court had been correct in ruling that the "3rd Lease Amendment" failed to incorporate the original lease of the larger property, ICE would still be responsible for paying the CAM fee, as that fee was specifically mentioned in the amendment.

effect." Thus, the trial court should have granted Wright's motion for summary judgment and denied ICE's motion for summary judgment on the issue of ICE's liability for CAM fees, utilities, and attorney fees with respect to both properties.

3. Wright contends that the trial court erred by ruling as a matter of law that he breached a "post-lease agreement" to install a sprinkler system in the larger property. As Wright points out, Section 3.1 of the original lease governing the larger property provided that the tenant had the responsibility to comply with all county ordinances and rules "at Tenant's own cost and expense," and Section 5 placed upon the tenant the burden to keep the non-structural portions of the property, including all fixtures, equipment, and appurtenances, in good repair. Thus, under the plain language of the original lease, as extended by the "3rd Lease Amendment," ICE had to pay for any non-structural upgrades needed to obtain a business license from the county, such as the installation of a sprinkler system or other fire-retardant measures.[4]

Wright maintains that questions of fact exist as to whether the parties departed from the terms of the lease by agreeing that Wright would install a sprinkler system.

---

[4] Black's defines a "structural alteration" as "[a] significant change to a building or other structure, essentially creating a different building or structure." Black's Law Dictionary (9th ed. 2009).

13

A mutual departure from the terms of an agreement results in a quasi-new agreement suspending the original terms of the agreement until one party has given the other reasonable notice of its intent to rely on the original terms. The question whether the parties' mutual conduct caused a waiver and effected a quasi-new agreement ordinarily is a question for the jury.

*Circle K Stores v. T. O. H. Assocs., Ltd.*, 318 Ga. App. 753, 754-755 (1) (734 SE2d 752) (2012) (punctuation and footnote omitted); see also OCGA § 13-4-4.[5] Although Wright's property manager, Warden, did send ICE an email and letter stating that Wright would pay for the installation of a sprinkler system "if the county forces the issue" and "there is no other alternative," there is no evidence in the record that ICE and Park worked with Wright and Warden to explore the feasibility of cheaper alternatives, much less evidence that the county explicitly rejected lesser measures. Accordingly, a trier of fact could determine that there was no meeting of the minds

_____

[5] OCGA § 13-4-4 provides as follows:
> Where parties, in the course of the execution of a contract, depart from its terms and pay or receive money under such departure, before either can recover for failure to pursue the letter of the agreement, reasonable notice must be given to the other of intention to rely on the exact terms of the agreement. The contract will be suspended by the departure until such notice.

14

to depart from the terms of the lease. The trial court erred by deciding this issue as a matter of law.

4. In his complaint, Wright sought $20,653.65 for expenses incurred in repairing ICE's alleged damage to the larger property. To help cover these expenses, as well as unpaid rent and fees, Wright retained ICE's security deposits (an amount totaling $5,403.55, according to ICE). The trial court ruled that Wright cannot prove that ICE damaged the property and that he therefore must return ICE's security deposits. Wright maintains that this ruling was erroneous, and we agree.

First, Wright may retain the security deposits to cover any unpaid rent for the period after ICE vacated the premises, but before another tenant moved in. See *Meek v. Mallory & Evans*, 318 Ga. App. 407, 410 (3) (734 SE2d 109) (2012) ("Because Meek is liable for unpaid rent under the contract, landlord was not barred from retaining the security deposit for nonpayment of rent.") (citation omitted). Second, the original lease for the larger property permitted Wright to use the security deposit in "such amount as may be necessary to restore [the premises] to their original condition, wear from normal usage excepted." Wright alleged that ICE damaged the premises, necessitating substantial repairs, and Wright presented Warden's affidavit and deposition testimony that ICE caused damage to both properties that exceeded

15

normal wear and tear. Although the trial court ruled that Wright could not recover for these damages because this evidence failed to show with certainty the condition of the property at the beginning of the tenancy or the precise amount of the repair costs, such questions may not be resolved on summary judgment. See *Abernethy v. Cates*, 182 Ga. App. 456-458 (1) (356 SE2d 62) (question of whether tenant breached lease provision to return premises in good repair was properly submitted to jury).

*Judgment reversed. Barnes, P. J., and Boggs, J., concur.*