**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**March 30, 2015**

# In the Court of Appeals of Georgia

A14A1598. McELVANEY v. ROUMELCO, LLC et al.

BRANCH, Judge.

Plaintiff Sean McElvaney brings this appeal from the trial court's grant of summary judgment to defendants Roumelco, LLC and its principal, Constantine Roumel (collectively, "Roumelco"), in McElvaney's suit for breach of contract concerning his investment of nearly $300,000 in Roumelco and its Atlanta real estate venture. The trial court held that McElvaney and Roumelco failed to reach a sufficiently definite agreement as to McElvaney's ownership interest in the company but that McElvaney could proceed on his unjust enrichment claim. On appeal, McElvaney argues that genuine questions of material fact remain as to his breach of contract claim and that the trial court also erred when it denied his request to appoint a receiver for Roumelco. Because we agree with the first of these contentions, we

reverse the grant of summary judgment to Roumelco, vacate the denial of McElvaney's motion for a receiver, and remand for further proceedings.

> To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. OCGA § 9-11-56 (c). A defendant may do this by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case.

*Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991) (emphasis omitted).

Viewed in favor of McElvaney, the record shows that in the fall of 2010, McElvaney hired Roumel to work for Armada Group, Inc. ("Armada"), a company owned solely by McElvaney. While working at Armada, Roumel learned of an opportunity to buy an apartment complex in Southeast Atlanta and approached McElvaney for help in acquiring the property. At Roumel's request, McElvaney provided all of a $100,000 deposit required to enter into a contract to purchase the property as well as an additional $38,000 in legal fees. Before the closing, which was set for June 2011, McElvaney and Roumel orally agreed that in exchange for 50 percent ownership of and shared decisionmaking concerning the property, they would

2

together give or otherwise "find," "from friends, relations, wherever," an additional $150,000 in cash necessary to close on the property. As McElvaney testified:

> It was always the agreement between . . . me and Mr. Roumel that we would find the money, together, [that] we would work our best in both directions to raise the money. It didn't matter whether it was him putting the money or me putting the money, but it was $300,000 . . . needed to close this deal, as I thought.

The parties also agreed that "when the apartment complex would be sold, or when [it] generated operating profits, the monies that were used to fund the purchase of the complex were to be repaid first to [McElvaney]," with "the remaining profits divided equally between" him and Roumel.

In May and June 2011, McElvaney made arrangements to borrow $144,350 from Kevin McKenna, a friend in Ireland, to be paid back to McKenna within three months at 25% annual interest. On June 3, Roumel wrote an email to a third party naming McElvaney as his "partner" in the property. On June 9, Roumelco purchased the property for cash and debt in the amount of $1,400,000. That same day, Roumel sent an email to McElvaney noting, "DONE DEAL PARTNER!!!!!!!!!" On June 14, McElvaney wired the $144,000 he had borrowed from McKenna to Armada; on the

same day, Roumel wrote himself an Armada check for that amount and deposited it in his personal bank account.

In the fall of 2011, and as a result of McElvaney's insistence on "written documentation" of the parties' agreement "from the start of the actual closing of the deal," Roumel and McElvaney executed a "Promise to Transfer Stock Agreement," which they backdated to June 10, 2011, and which provided in relevant part:

> Roumel agrees to transfer 47% of stock [in Roumelco] to Sean McElvaney. In return[,] Sean McElvaney is to make [a] cash investment of approximately 300k to Roumelco, LLC. The actual transfer of stock is to take place any time Sean McElvaney desires. In addition Mr. McElvaney is to receive priority pay[ment] for his full investment.

The stock agreement also provided that Roumel would transfer 3% each of Roumelco stock to two other men, Constantine Dantoulis and Constantine Simoglou. On December 7, 2011, Roumel wrote a letter to McElvaney and the two other minority owners as follows:

> This letter acknowledges that each of you is entitled to the following percentage *interest in the income, proceeds of sale, proceeds from refinancing debt, and all other items of net operating income and losses* from the operation of the apartments known as Park Vista and located at 1940 Fisher Road, SE, Atlanta, Georgia. In addition, Sean (McElvaney) is entitled to receive from such proceeds, the balance of his

4

contribution of the initial down payment of equity for the purchase of the apartments; that amount is AP[p]R[oximately] $200,000.00.

(Emphasis supplied.) The letter then restated that McElvaney owned 47% of Roumelco, with Dantoulis and Simiglou owning 3% each. In August 2012, Roumel sent an email to prospective buyers of the property in which Roumel again referred to McElvaney as his "partner."

Meanwhile, in the course of the year following the June 2011 closing, with the apartment complex generating revenue of approximately $100,000 a month, McElvaney wrote a series of checks from his solely owned company's account totaling more than $30,000 for expenses associated with the property and received an unspecified amount from Roumelco as repayment of the funds he had advanced. Records from Roumelco's Wells Fargo account and testimony from the company's own bookkeeper also indicate that between June 2011 and September 2012, Roumel used Roumelco funds for his own and his family's expenses, made numerous ATM withdrawals amounting to over $20,000, and diverted over $60,000 of company funds into overseas accounts held by family members in Greece and Cyprus. Roumel also failed to pay amounts due on the complex's mortgage, which went into default in February 2013, and its water bill.

On September 18, 2012, McElvaney brought this action against Roumel and Roumelco for breach of contract, specific performance, fraud, breach of fiduciary duty, unjust enrichment, and other claims, and seeking an accounting as well as declaratory and injunctive relief. In May 2013, Roumelco moved for summary judgment on all of McElvaney's claims except unjust enrichment, arguing that Roumel and McElvaney had never reached any enforceable agreement as to McElvaney's ownership interest in Roumelco. In June 2013, McElvaney moved for the appointment of a receiver concerning Roumelco. After a hearing, the trial court granted Roumel's motion for summary judgment as to all McElvaney's claims except unjust enrichment on the ground that undisputed evidence showed that the parties had never reached an enforceable agreement as to their respective ownership interests in Roumelco. The trial court also denied McElvaney's motion for a receiver on the ground that McElvaney had failed to prove any ownership interest in the company and therefore lacked standing to obtain a receiver for Roumelco.

1. McElvaney argues that even if there was some initial uncertainty as to the precise terms of the oral agreement he reached with Roumel as to the two men's ownership of Roumelco, the evidence, including the parties' writings, conduct, and

testimony, precludes summary judgment for Roumel on McElvaney's breach of contract claim.[1] We agree.

"Under Georgia law, a contract does not exist unless the parties agree on all material terms. A contract cannot be enforced if its terms are incomplete, vague, indefinite or uncertain. Thus, a court will not enforce an agreement where it is left to ascertain the intention of the parties by conjecture." *Kitchen v. Insuramerica Corp.*, 296 Ga. App. 739, 743 (1) (675 SE2d 598) (2009) (punctuation and footnote omitted). But Georgia law "does not favor destruction of contracts on grounds of uncertainty," such that an "indefinite" contract "may acquire more precision and become enforceable because of the subsequent words or actions of the parties." Id. (punctuation and footnote omitted).

Even assuming that Roumel and McElvaney's oral agreement was not sufficiently definite as to their respective ownership interests in Roumelco before the company bought the property at issue on June 9, 2010, it is undisputed that at some point in the fall of 2010, and again in December 2011, Roumel admitted in writing that McElvaney owned 47% of the company. Construed in McElvaney's favor, the

---

[1] The parties have not argued, and we do not reach, the merits of McElvaney's remaining claims, including breach of fiduciary duty. McElvaney's request for appointment of a receiver is addressed in Division 2 below.

7

record also supports a conclusion that he obtained this ownership interest as consideration for his provision of at least $138,000 of his own funds and an additional $144,000 of borrowed funds.

Roumelco seeks to forestall this conclusion by pointing to apparent contradictions between McElvaney's first amended complaint, which alleged that he agreed to "give" the $300,000 necessary to close the deal, and his deposition testimony, in which McElvaney testified that he agreed to "help find" the additional $150,000 necessary after the $138,000 already contributed. But McElvaney's second amended complaint, which was filed before his deposition, alleged only that he would "fund" the amounts necessary "in the amount of approximately . . . $300,000" by combining approximately $150,000 of his own funds with an additional $144,000 procured from other sources. Further, arguable inconsistencies between McElvaney's pleadings and his deposition testimony as to the sources of money used to obtain the property do not eliminate the question of fact established by Roumel's post-closing memoranda as to whether the parties agreed to a division of ownership interests by that closing.

Roumelco also cites *Razavi v. Shacklford*, 260 Ga. App. 603 (580 SE2d 253) (2003), and *Green v. Zaring*, 222 Ga. 195 (149 SE2d 115) (1966), as support for his

8

position that the parties failed to reach an enforceable agreement. In *Razavi*, we affirmed a trial court's conclusion that an oral agreement to share equally the profits of a real estate venture was too vague to be enforced, commenting that "[p]erformance does not cure the deficiencies in an agreement that is so vague, indefinite, and uncertain as to make it impossible for courts to determine what, if anything, was agreed upon[.]" Id. at 605 (1) ( punctuation and footnote omitted). But there was no evidence in *Razavi* that the plaintiff, who was seeking to cancel defendants' liens on the properties at issue, ever admitted that the defendant had any ownership share in the venture, whereas the evidence before us contains two written admissions by Roumel as to McElvaney's ownership interest in Roumelco. There was no allegation in *Green*, moreover, that any deficiencies as to certainty were "cured by performance or conduct of the parties," id. at 199 (1), whereas Roumel's two post-closing memoranda memorialize the parties' intent to convey at least 47% percent of Roumelco to McElvaney.

Construed in McElvaney's favor, this record raises a question of fact as to whether the parties to this transaction agreed to grant McElvaney an enforceable ownership interest in Roumelco by the time the company purchased the property. The trial court therefore erred when it granted Roumelco summary judgment on

9

McElvaney's breach of contract claim. *Mon Ami Intl. v. Gale*, 264 Ga. App. 739, 742 (2) (592 SE2d 83) (2003) (agreement that employee would receive ten percent of corporation as consideration for joining company was sufficiently definite to establish an enforceable contract); *Kitchen*, 296 Ga. App. at 743-744 (1) (trial court erred in granting summary judgment to defendant in plaintiff's claim to enforce an agreement for 25 percent ownership interest of corporations "in partial consideration for his employment").

2. McElvaney also argues that the trial court abused its discretion when it denied his motion to appoint a receiver. We order further proceedings on the issue.

OCGA § 9-8-1 provides that "[w]hen any fund or property is in litigation and the rights of either or both parties cannot otherwise be fully protected or when there is a fund or property having no one to manage it, a receiver of the same may be appointed by the judge of the superior court having jurisdiction thereof." A receiver may be appointed "to take possession of and hold, subject to the direction of the court, any assets charged with the payment of debts where there is manifest danger of loss, destruction, or material injury to those interested." OCGA § 9-8-3. Thus when a defendant has

fraudulently obtained money from [a] plaintiff and invested it in personal property, the plaintiff, who seeks to assert an equitable title or lien upon the property so purchased with his funds, is entitled to the appointment of a receiver to take charge of such property, and a temporary injunction, where the defendant is insolvent, and there is danger of the loss of such equitable title or lien[,] by the sale of such property by the insolvent defendant.

*Crook v. Citizens Bank of Blakely*, 153 Ga. 301 (111 SE2d 916) (1922) (citations omitted). "The grant or refusal of a receivership is a matter addressed to the sound legal discretion of the trial court, the exercise of which will not be interfered with on appeal unless such discretion be manifestly abused." *Fulp v. Holt*, 284 Ga. 751, 752 (670 SE2d 785) (2008) (citation and punctuation omitted) (in light of evidence that a law firm partner misappropriated firm funds and borrowed money on the firm's line of credit without the other party's permission, a trial court did not abuse its discretion in appointing a receiver).

Roumelco argues that the request for a receiver is moot in light of the affidavit attached to their appellate brief suggesting that the property was sold in April 2014. Court of Appeals Rule 25 (g) instructs parties not to attach "any document or exhibit to an appellate brief," however. Even if we were to consider Roumelco's affidavit, moreover, McElvaney correctly points out that his motion sought a receiver as to both

11

Roumelco, including "without limitation its rental income and bank accounts," and the underlying property. The trial court denied the motion on the ground that McElvaney had no ownership interest in the company as a matter of law and therefore lacked standing to seek a receiver. In Division 1, we conclude that a question of fact remains as to the extent of McElvaney's ownership interest in Roumelco, and the evidence outlined above suggests that company funds remain at risk. We therefore vacate that portion of the trial court's order denying McElvaney's appointment of a receiver and remand for reconsideration of this issue, which is not moot. The trial court should exercise its discretion as to the appointment of a receiver as soon as practicable upon receipt of the remittitur from this Court.

*Judgment reversed in part and vacated in part, and case remanded with direction. Barnes, P. J., and Boggs, J., concur.*